605 A.2d 1079

ANGELINA LANDRIGAN, ADMINISTRATRIX AND ADMINISTRATRIX AD PROSEQUENDUM OF THE ESTATE OF THOMAS LANDRIGAN, DECEASED; AND ANGELINA LANDRIGAN, INDIVIDUALLY, PLAINTIFF–APPELLANT AND CROSS–RESPONDENT, v. THE CELOTEX CORPORATION, SUCCESSOR IN INTEREST TO PHILIP CAREY MANUFACTURING CO., PHILIP CAREY CORP., BRIGGS MANUFACTURING CO., AND PANACON CORP.; RAYMARK CORPORATION, SUCCESSOR TO AND IN LIEU OF RAYBESTOS–MANHATTAN, INC.; RAYMARK INDUSTRIES, INC., SUCCESSOR TO AND IN LIEU OF RAYBESTOS–MANHATTAN, INC.; NICOLET, INC., INDIVIDUALLY AND AS SUCCESSOR TO KEASBEY & MATTISON COMPANY; EAGLE–PICHER INDUSTRIES, INC.; FLINTKOTE COMPANY; GAF CORPORATION, SUCCESSOR BY MERGER TO THE RUBEROID CO.; ARMSTRONG CORK COMPANY; PITTSBURGH CORNING CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO UNARCO, INC.; KEENE CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO BALDWIN–EHRET HILL CO.; BALDWIN HILL CO. AND EHRET MAGNESIA MANUFACTURING CO., KEENE BUILDING PRODUCTS CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO BALDWIN–EHRET HILL CO., BALDWIN HILL CO. AND EHRET MAGNESIA MANUFACTURING CO.; SOUTHERN TEXTILE CORPORATION, INDIVIDUALLY AND AS SUCCESSOR TO SOUTHERN ASBESTOS COMPANY, THE THERMOID COMPANY, CHARLOTTE WORKS, CAROLINA ASBESTOS CO., INC., DAVIDSON WORKS, RUSSELL MANUFACTURING CO. AND BENNETTVILLE WORKS; H.K. PORTER COMPANY, INC., INDIVIDUALLY AND AS SUCCESSOR TO SOUTHERN TEXTILE CORPORATION, SOUTHERN ASBESTOS COMPANY, THE THERMOID COMPANY, CHARLOTTE WORKS, CAROLINA ASBESTOS CO., INC., DAVIDSON WORKS, RUSSELL MANUFACTURING CO. AND BENNETTVILLE WORKS; FI-

BREBOARD CORPORATION, SUCCESSOR TO PABCO; PA-COR, INC., INDIVIDUALLY AND AS SUCCESSOR TO PHILA-DELPHIA ASBESTOS CORPORATION AND PHILADELPHIA ASBESTOS COMPANY; YORK INDUSTRIES, INC., A/K/A YORK INSULATION CO.; GARLOCK, INC.; PORTER HAYDEN COMPANY; S. FRANKLIN & SONS; FIBER FLEX, INC.; WALLWORK-SOMERSET COMPANY; VIKING INSULATION COMPANY; SJB PIPE COMPANY; WALLWORK BROS. COM-PANY; BAYONNE PLUMBING SUPPLY COMPANY; INTER-NATIONAL-MATEX TANK TERMINALS, A/K/A BAYONNE TERMINAL WAREHOUSE CORPORATION, A/K/A BAYONNE INDUSTRIES, INC.; ROBERT A. KEASBEY COMPANY; GALL AND SANDERS; ALBERT DOE; BEN DOE; CHARLES DOE; DONALD DOE; EUGENE DOE; FRED DOE; GEORGE DOE; JOHN DOE; KEN DOE; LARRY DOE; AND MICHAEL DOE, DEFENDANTS, AND OWENS ILLINOIS, INC.; OWENS-CORN-ING FIBERGLASS CORPORATION, DEFENDANTS-RESPON-DENTS AND CROSS-APPELLANTS.

Argued March 25, 1991—Reargued September 11, 1991.
Decided May 6, 1992.

408

*James C. Gavin* argued the cause for appellant and cross-respondent (*Gavin & Gavin,* attorneys; *James C. Gavin* and *Sandra F. Gavin,* on the briefs).

*Gita F. Rothschild* argued the cause for respondent and cross-appellant Owens Illinois, Inc. (*McCarter & English,* attorneys; *Gita F. Rothschild, Andrew T. Berry,* and *Therese M. Keeley,* of counsel; *John C. Garde* and *Rosanne C. Kemmet,* on the briefs).

*Robert E. Paarz* argued the cause for respondent and cross-appellant Owens–Corning Fiberglass Corporation (*Horn, Kaplan, Goldberg, Gorny & Daniels,* attorneys; *Robert E. Paarz, Donald M. Kaplan,* and *David A. Speziali,* of counsel; *Donald M. Kaplan* and *Raymond R. Chance, III,* on the briefs).

The opinion of the Court was delivered by

POLLOCK, J.

Plaintiff, Angelina Landrigan, sued defendants Owens–Corning Fiberglass Corporation and Owens Illinois, Inc. for the personal injuries and death of her husband, Thomas Landrigan, claiming that exposure to defendants' asbestos had caused his death from colon cancer. She also sued The Celotex Corporation, against which all actions are stayed because it is in bankruptcy. Reference in this opinion to "defendants" is to Owens–Corning Fiberglass Corporation and Owens Illinois, Inc. To prove causation, plaintiff relied on the testimony of two witnesses, a medical doctor and an epidemiologist. The trial court rejected both experts' conclusions. It rejected the medical doctor's conclusion as a "net opinion," unsubstantiated by facts or reasons. The court ruled that the epidemiologist, not being a physician, was unqualified to render an opinion that asbestos exposure caused cancer in a specific individual. The Appellate Division affirmed. 243 *N.J.Super.* 449, 579 *A.2d* 1268 (1990). We granted certification, 127 *N.J.* 324, 604 *A.2d* 599 (1990), and now reverse and remand to the Law Division.

-I-

Decedent worked as a maintenance man and pipe insulator at the Bayonne Terminal Warehouse from 1956 until December 1981, when he was diagnosed as suffering from colon cancer. From 1956 until 1972, he allegedly worked with insulation containing asbestos supplied by defendants. In January 1982, he underwent surgery but the cancer spread, and he died in December 1982. The cause of his death was adenocarcinoma, "a malignant adenoma arising from a glandular organ," *Taber's Cyclopedic Medical Dictionary* 36 (15th ed. 1985), the most common type of colon cancer. Generally speaking, colorectal cancer is the second most common cancer in the United States, striking 140,000 persons and causing 60,000 deaths annually. *Colonoscopy Recommended, Am. Med. News*, Sept. 16, 1991, at 39. In 1984, plaintiff filed this survivorship and wrongful death action, asserting that exposure to asbestos had caused decedent's death.

On defendants' motions, the trial court directed plaintiff to elect to try her claims under a strict liability theory predicated on defendants' failure to warn, in which defendants would be barred from proving that they had neither known nor could have known that asbestos was dangerous (the state-of-the-art defense), see *Beshada v. Johns–Manville Prods. Corp.*, 90 *N.J.* 191, 447 *A.*2d 539 (1982)), or under a combined strict liability and negligence theory. The court ruled that if plaintiff proceeded under the combined theory, it would not charge that knowledge of the dangers of asbestos was imputed to defendant. Plaintiff elected to proceed solely under the strict liability theory, thereby barring defendants' state-of-the-art defense.

At the trial in 1989, plaintiff relied on two experts, Dr. Joseph Sokolowski, Jr., a physician who is board certified in both internal medicine and pulmonary medicine, and Dr. Joseph K. Wagoner, an epidemiologist and biostatistician but not a physician. Dr. Sokolowski never treated or examined decedent. He based his conclusions on a review of decedent's history of

exposure to asbestos, the absence of other risk factors in decedent's history, and on various epidemiological, animal, and *in vitro* studies. Stating that physicians regularly rely on epidemiological studies, Dr. Sokolowski testified that asbestos can cause colon cancer in humans. He also described the path asbestos fibers take from inhalation to the gastrointestinal tract.

Dr. Sokolowski testified that exposure to asbestos was the cause of decedent's colon cancer. He relied on the ability of asbestos to cause colon cancer in humans, decedent's exposure to asbestos, and the absence of other risk factors, such as a high-fat diet, excessive alcohol consumption, a family history of colon cancer, and prior bowel disease. Dr. Sokolowski testified further that decedent would not have contracted colon cancer if he had not been exposed to asbestos.

Plaintiff also offered Dr. Wagoner to testify that asbestos exposure had caused decedent's colon cancer. After conducting a hearing pursuant to *Evidence Rule* 8, the trial court ruled that as an epidemiologist and not a physician, Dr. Wagoner was not qualified to testify that asbestos had caused decedent's cancer. The court, however, permitted the witness to testify about epidemiological methods and studies linking colon cancer to asbestos exposure. It also allowed Dr. Wagoner to state his opinion that asbestos causes colon cancer in humans. Finally, Dr. Wagoner testified that a low-fiber diet is associated with an increased risk of colon cancer, and that smoking, hemorrhoids, arthritis, and moderate alcohol consumption are not so associated.

At the close of plaintiff's case, the trial court granted defendants' motions for a directed verdict. See *Rule* 4:40–1. The court ruled that Dr. Sokolowski's testimony was a net opinion because it was supported only by epidemiological studies and the exclusion of other risk factors, explaining:

> Epidemiological evidence can only be used to show that a defendant's conduct increased a plaintiff's risk of injury to some measurable extent but it cannot be used to answer the critical question did the asbestos cause Mr. Landrigan's

colon cancer. Judge Deighan so stated in the case of [*Thompson v. Merrell Dow Pharmaceuticals*, 229 *N.J.Super.* 230 [551 *A.2d* 177] (App.Div.1988)].

The court also rejected plaintiff's proffer concerning Dr. Wagoner's testimony, stating:

> Dr. Wagoner is not a medical doctor. He never prescribed a course of treatment for cancer patients. He conducted no human research. Dr. Wagoner teaches that if you can't find the cause of a disease by medical observation and you can find no other cause for it, you then go to these studies that have been conducted and pick a cause from a known risk or an increased risk factor.
>
> Again, I repeat that epidemiology cannot be used to predict an occurrence of health related events for a given specific individual. Therefore, it is this Court's decision that the colon cancer claim of Mr. Landrigan and Mrs. Landrigan is dismissed as to all defendants.

Concerning Dr. Wagoner, the Appellate Division apparently relied on the fact that he had used only epidemiological methods:

> Dr. Wagoner's qualifications as an epidemiologist and biostatistician did not endow his opinion as to proximate cause with the expertise necessary to "assist the trier of fact to understand the evidence or determine [the] fact in issue" [quoting *Evid.R.* 56(2)]. As we noted earlier, epidemiology deals with the movement of different diseases within human populations. It does not address questions of specific causation in the individual case. While epidemiological information, taken together with other medical facts, may be useful to a physician in forming a particular diagnosis or in determining the etiology of an illness, court determinations as to such matters cannot be based on an expert opinion which rests on the application of statistical skills and studies alone. [243 *N.J.Super.* at 462, 579 *A.2d* 1268.]

Epidemiology, then, relates to two aspects of plaintiff's proof. For the physician, Dr. Sokolowski, epidemiological studies provided some of the facts on which he relied to conclude that asbestos exposure had caused decedent's colon cancer. Concerning Dr. Wagoner, the epidemiologist, the main issue was whether he was qualified as a non-physician to render an opinion that the exposure had been the cause of decedent's cancer.

-II-

-A-

In recent years, we have sought to accommodate the requirements for the admission of expert testimony with the need for

that testimony. See *Rubanick v. Witco Chem. Corp.*, 125 *N.J.* 421, 593 *A.*2d 733 (1991); *Ryan v. KDI Sylvan Pools, Inc.*, 121 *N.J.* 276, 579 *A.*2d 1241 (1990). Nowhere is that accommodation more compelling than on the issue of causation in toxic-tort litigation concerning diseases of indeterminate origin. Many such injuries remain latent for years, are associated with diverse risk factors, and occur without any apparent cause. Steve Gold, Note, *Causation in Toxic Torts: Burdens of Proof, Standards of Persuasion, and Statistical Evidence*, 96 *Yale L.J.* 376, 376 (1986) (hereinafter Gold). In that context, proof that a defendant's conduct caused decedent's injuries is more subtle and sophisticated than proof in cases concerned with more traditional torts.

■ *Evidence Rule* 56(2), which governs the admission of opinion testimony, states in relevant part:

> A witness qualified pursuant to Rule 19 as an expert by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue.

The Rule imposes three basic requirements: (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony. *State v. Kelly*, 97 *N.J.* 178, 208, 478 *A.*2d 364 (1984).

Our focus is on the last two requirements, that the testimony is reliable and that the witness is qualified to offer the intended testimony. In *Rubanick*, which we decided after the Appellate Division had rendered its opinion in this case, we modified the standard for the admission of expert testimony, holding that

> in toxic-tort litigation, a scientific theory of causation that has not yet reached general acceptance may be found to be sufficiently reliable if it is based on a sound, adequately-founded scientific methodology involving data and information of the type reasonably relied on by experts in the scientific field. The evidence of such scientific knowledge must be proffered by an expert who is

sufficiently qualified by education, knowledge, training, and experience in the specific field of science. The expert must possess a demonstrated professional capability to assess the scientific significance of the underlying data and information, to apply the scientific methodology, and to explain the bases for the opinion reached. [125 *N.J.* at 449, 593 *A.2d* 733.]

*Rubanick* changed the emphasis for the admission of expert testimony from general acceptance in the scientific community to the methodology and reasoning supporting the testimony. Although we acknowledged the controversy surrounding that change, we determined that "there are sound reasons for adopting a broadened standard for determining the reliability and admissibility of scientific theories of causation in toxic-tort litigation." *Id.* at 454, 593 *A.2d* 733.

The trial court in *Rubanick* had ruled inadmissible the testimony of a biochemist who had testified that polychlorinated biphenyls (PCBs) could cause colon cancer. We directed the court to reconsider that testimony under the previously-quoted standard.

The admissibility of such testimony depends on the expert's ability to explain pertinent scientific principles and to apply those principles to the formulation of his or her opinion. Thus, the key to admission of the opinion is the validity of the expert's reasoning and methodology. *Id.* at 449, 593 *A.2d* 733; *see* Bert Black, *A Unified Theory of Scientific Evidence,* 56 *Fordham L. Review* 595, 604 (1988) (hereinafter Black) ("when expert witnesses are forced to make their reasoning explicit, courts can evaluate it against accepted scientific practice"). In resolving these issues, the trial court should not substitute its judgment for that of the relevant scientific community. The court's function is to distinguish scientifically sound reasoning from that of the self-validating expert, who uses scientific terminology to present unsubstantiated personal beliefs. *See State v. Zola,* 112 *N.J.* 384, 447, 548 *A.2d* 1022 (1988) (Handler, J., dissenting); *Kelly, supra,* 97 *N.J.* at 209, 478 *A.2d* 364; *Buckelew v. Grossbard,* 87 *N.J.* 512, 525, 435 *A.2d* 1150 (1981); *cf.* Black, *supra,* 56 *Fordham L. Review* at 633 ("an uncritical

approach to acceptance allows a group that advocates a technique or method to self-validate it simply by declaring acceptance").

Traditionally, plaintiffs have established a connection between tortious conduct and personal injuries through the testimony of medical experts who testify that the defendant's specific conduct was the cause of the plaintiff's injuries. Toxic torts, however, do not readily lend themselves to proof that is so particularized. *Developments in the Law—Toxic Waste Litigation*, 99 *Harv.L.Rev.* 1458, 1620 (1986). Plaintiffs in such cases may be compelled to resort to more general evidence, such as that provided by epidemiological studies. A basic understanding of some fundamentals of epidemiology is essential for an assessment of the admissibility of such evidence.

Simply defined, epidemiology is "the study of disease occurrence in human populations." Gary D. Friedman, *Primer of Epidemiology* 1 (3d ed. 1987) (hereinafter Friedman). Epidemiology studies the relationship between a disease and a factor suspected of causing the disease, using statistical methods to determine the likelihood of causation. Bert Black & David E. Lilienfeld, *Epidemiologic Proof in Toxic Tort Litigation*, 52 *Fordham L. Review* 732, 750 (1984) (hereinafter Black & Lilienfeld). By comparison to the clinical health sciences, which are directly concerned with diseases in particular patients, epidemiology is concerned with the statistical analysis of disease in groups of patients. The statistical associations may become so compelling, as they did in establishing the correlation between asbestos exposure and mesothelioma, that they raise a legitimate implication of causation. *See id.* at 758. "[S]tatistical associations," however, "do not necessarily imply causation. * * * It is important, therefore, to have some basis for deciding whether a statistical association derived from an observational study represents a cause-and-effect relationship." Friedman, *supra*, at 182–83. *See* Austin B. Hill, *The Environment and Disease: Association or Causation?*, 58 *Proc. Royal Soc. Med.* 295 (1965) (criteria to assess likelihood of causal relationship

from statistical associations). At oral argument, defendants, for example, stressed two criteria, among others, that are crucial in determining whether a statistical association will give rise to an inference that a particular substance causes a certain disease in people who are exposed to it. The two criteria are the strength of the association and the consistency of any such association with other knowledge. The argument is sound. As Professor Friedman explains:

> In general, the stronger the association, the more likely it represents a cause-and-effect relationship. ·Weak associations often turn out to be spurious and explainable by some known, or as yet unknown, confounding variable. In order for an association to be spurious, the underlying factor that explains it must have a stronger relationship to the disease than the suspected causal factor. When the causal factor under consideration is strongly related to the disease, it is likely, although not certain, that the underlying variable with the necessarily even stronger relationship to the disease would be recognizable.
>
> Strength of an association is usually measured by the *relative risk* or the ratio of the disease rate in those with the factor to the rate in those without. The relative risk of lung cancer in cigarette smokers as compared to non-smokers is on the order of 10:1, whereas the relative risk of pancreatic cancer is about 2:1. The difference suggests that cigarette smoking is more likely to be a causal factor for lung cancer than for pancreatic cancer.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> If the association makes sense in terms of known biological mechanisms or other epidemiologic knowledge, it becomes more plausible as a cause-and-effect relationship. Part of the attractiveness of the hypothesis that a high-saturated fat, high-cholesterol diet predisposes to atherosclerosis is the fact that a biologic mechanism can be invoked. Such a diet increases blood lipids, which may in turn be deposited in arterial walls. A correlation between the number of telephone poles in a country and its coronary heart disease mortality rate lacks plausibility as a cause-and-effect relationship partly because it is difficult to imagine a biologic mechanism whereby telephone poles result in atherosclerosis. [*Id.* at 183–84 (citation omitted).]

The "attributable risk," by comparison, is the proportion of the disease that is statistically attributable to the factor. Black & Lilienfeld, *supra,* 52 *Fordham L. Review* at 761. It "is a composite measure that takes into account both the relative risk of disease if exposed and the proportion of the population so exposed." *Ibid.*

For our purposes, we need not describe in detail how to structure an epidemiological study, analyze the data, draw conclusions about the study population, and, if possible, extrapolate from statistical results inferences about specific individual subjects. It suffices to state that at a *Rule* 8 hearing epidemiologists, like experts generally, must be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable. That explanation will enable the trial court to determine whether the expert's opinion "will assist the trier of fact to understand the evidence or determine a fact in issue," *Evid. R.* 56(2), or whether the opinion is, in current parlance, "junk science."

Making these determinations often "will be complicated and the ultimate decision difficult." *Rubanick, supra,* 125 *N.J.* at 449, 593 *A.*2d 733. We agree with defendants that when an expert relies on such data as epidemiological studies, the trial court should review the studies, as well as other information proffered by the parties, to determine if they are of a kind on which such experts ordinarily rely. The court should then determine whether the expert's opinion is derived from a sound and well-founded methodology that is supported by some expert consensus in the appropriate field. *Id.* at 449–50, 593 *A.*2d 733.

Defined landmarks guide a trial court in making this determination. Support may be demonstrated by reference to professional journals, texts, conferences, symposia, or judicial opinions accepting the methodology. *See Kelly, supra,* 97 *N.J.* at 210–11, 478 *A.*2d 364. Additionally, recognized professional societies may have positions that help determine the soundness of the witness's approach. Finally, the witness's qualifications may be relevant in assessing the soundness of his or her methodology. *Rubanick, supra,* 125 *N.J.* at 452, 593 *A.*2d 733. On meeting these requirements, a witness with appropriate expertise in epidemiology may rely on a combination of epidemiological studies and particularized proof about an individual to

testify that exposure to a toxic substance has caused the person's disease. *See Grassis v. Johns–Manville Corp.*, 248 *N.J.Super.* 446, 454, 591 *A.*2d 671 (App.Div.1991).

■ Turning to the experts in this case, plaintiff's medical expert was Dr. Sokolowski. Initially, he explained that he had examined certain literature on colon cancer, including the landmark study by Dr. Irving Selikoff. See Irving Selikoff et al., *Mortality Experience of Insulation Workers in the United States and Canada*, 330 *Annals N.Y. Acad. Sci.* 91 (1979). The study indicated a relative risk of colon cancer from the exposure to asbestos of 1.55. The attributable risk, which would vary according to the extent and intensity of the exposure, was approximately thirty-five percent. Thus, assuming a causal relationship, the Selikoff study indicates that thirty-five percent of the cases of colon cancer in the population exposed to asbestos can be attributed to that exposure.

Dr. Sokolowski had never treated or examined decedent, but he had reviewed decedent's medical records and plaintiff's answers to interrogatories. Those materials indicated that decedent had been exposed to asbestos in his work. They also indicated the absence of other risk factors such as a family history of colon cancer, a high-fat diet, and the undue consumption of alcohol. Dr. Sokolowski acknowledged that "many studies * * * show no statistically significant increase in colon cancer in workers exposed to asbestos." Finally, he relied on the results of animal and *in vitro* studies.

The trial court rejected Dr. Sokolowski's testimony as a "net opinion" unsupported by any facts. Specifically, the court stated that "[e]pidemiological evidence can only be used to show that a defendant's conduct increased a plaintiff's risk of injury to some measurable extent but it cannot be used to answer the critical question did the asbestos cause Mr. Landrigan's colon cancer."

The Appellate Division agreed with that assessment, explaining that Dr. Sokolowski had failed to account for other factors

that may have caused decedent's cancer. Although it accepted the validity of the Selikoff study, the court stated that the 1.55 relative risk was insufficient to support Dr. Sokolowski's opinion that decedent's exposure had caused the cancer. Without expressly adopting a specific standard, the court cited with approval several cases that adopted a requirement that an epidemiological study show a relative risk in excess of 2.0 to prove that causation in a specific individual was more probable than not. The significance of a relative risk greater than 2.0 representing a true causal relationship is that the ratio evidences an attributable risk of more than fifty percent, which means that more than half of the cases of the studied disease in a comparable population exposed to the substance are attributable to that exposure. This finding could support an inference that the exposure was the probable cause of the disease in a specific member of the exposed population.

Defense counsel urges that the Appellate Division opinion may be read as requiring that an expert may not rely on an epidemiological study to support a finding of individual causation unless the relative risk is greater than 2.0. See 243 *N.J.Super.* at 457–59, 579 *A.*2d 1268. At oral argument before us, they agreed that such a requirement may be unnecessary. Counsel acknowledged that under certain circumstances a study with a relative risk of less than 2.0 could support a finding of specific causation. Those circumstances would include, for example, individual clinical data, such as asbestos in or near the tumor or a documented history of extensive asbestos exposure. So viewed, a relative risk of 2.0 is not so much a password to a finding of causation as one piece of evidence, among others, for the court to consider in determining whether the expert has employed a sound methodology in reaching his or her conclusion.

If epidemiological studies are to provide the basis for an expert's opinion, they must have been "soundly and reliably generated" and be "of a type reasonably relied on by compara-

ble experts in the particular field." *Rubanick, supra,* 125 *N.J.* at 447, 593 *A.*2d 733; *see also Kelly, supra,* 97 *N.J.* at 209–11, 478 *A.*2d 364 (general discussion of means to demonstrate acceptability of scientific evidence); Michael Dore, *A Commentary on the Use of Epidemiological Evidence in Demonstrating Cause–in–Fact,* 7 *Harv.Envtl.L.Rev.* 429, 432 (1983) ("The usefulness of an epidemiological study depends on the quality of the underlying data, the reliability of the methodology, and the validity of the interpretations."). A finding that experts in the field rely on certain data raises a presumption that such reliance is reasonable. *Ryan, supra,* 121 *N.J.* at 289, 579 *A.*2d 1241.

The court must also examine the manner in which experts reason from the studies and other information to a conclusion. As previously indicated, that conclusion must derive from a sound methodology that is supported by some consensus of experts in the field. *Rubanick, supra,* 125 *N.J.* at 449–50, 593 *A.*2d 733.

In the present case, Dr. Sokolowski began by reviewing the scientific literature to establish both the ability of asbestos to cause colon cancer and the magnitude of the risk that it would cause that result. Next, he assumed that decedent was exposed to asbestos and that his exposure, in both intensity and duration, was comparable to that of the study populations described in the literature. He then assumed that other known risk factors for colon cancer did not apply to decedent. After considering decedent's exposure and the absence of those factors, Dr. Sokolowski concluded that decedent's exposure more likely than not had been the cause of his colon cancer.

Without limiting the trial court on remand, its assessment of Dr. Sokolowski's testimony should include an evaluation of the validity both of the studies on which he relied and of his assumption that the decedent's asbestos exposure was like that of the members of the study populations. The court should also verify Dr. Sokolowski's assumption concerning the absence

of other risk factors. Finally, the court should ascertain if the relevant scientific community accepts the process by which Dr. Sokolowski reasoned to the conclusion that the decedent's asbestos exposure had caused his cancer. Thus, to determine the admissibility of the witness's opinion, the court, without substituting its judgment for that of the expert, should examine each step in Dr. Sokolowski's reasoning.

-B-

The trial court also rejected the testimony of plaintiff's second witness on causation, Dr. Wagoner, an epidemiologist. The court permitted Dr. Wagoner to testify generally that asbestos can cause colon cancer, but precluded him from testifying specifically that exposure to defendants' asbestos had caused decedent's cancer. In barring the witness from so testifying, the court stated that Dr. Wagoner

> cannot give an opinion as to causation, based upon the reasoning that has been argued here that the doctor is not a medical doctor. He has never treated patients. * * * He will be permitted to testify as an epidemiologist and not give any opinion as to whether or not this man's colon cancer was caused by his exposure to asbestos.

The Appellate Division agreed. 243 *N.J.Super.* at 462, 579 *A.*2d 1268.

In the interim, we decided *Rubanick*, in which we affirmed an Appellate Division ruling that a witness who was a biochemist, but not a physician, could testify that exposure to PCBs had caused colon cancer in the individual plaintiffs. Defendants' brief in the instant case, written before our opinion in *Rubanick*, acknowledges that the *Rubanick* ruling in the Appellate Division conflicts with their contention that persons other than licensed physicians, such as epidemiologists, are unqualified to offer a medical opinion about the cause of colon cancer in a specific individual. Defendants acknowledge that *Rubanick* permits an otherwise qualified witness who is not a physician to testify that a toxic substance caused colon cancer in a specific plaintiff. In light of our intervening decision in *Rubanick*, we

are obliged to reverse the judgment of the Appellate Division and remand the matter to the trial court for retrial.

Our decision does not necessarily mean that on remand the trial court must reach a different result. Although the diagnosis of decedent's disease and the cause of his death are not in dispute, the parties vigorously contest the probability that decedent's colon cancer was caused by asbestos exposure. The issue posed to both Dr. Wagoner and Dr. Sokolowski was the likelihood that decedent's colon cancer was caused by asbestos exposure. Dr. Wagoner did not rely exclusively on epidemiological studies in addressing that issue. In addition to relying on such studies, he, like Dr. Sokolowski, reviewed specific evidence about decedent's medical and occupational histories. Both witnesses also excluded certain known risk factors for colon cancer, such as excessive alcohol consumption, a high-fat diet, and a positive family history. From statistical population studies to the conclusion of causation in an individual, however, is a broad leap, particularly for a witness whose training, unlike that of a physician, is oriented toward the study of groups and not of individuals. Nonetheless, proof of causation in toxic-tort cases depends largely on inferences derived from statistics about groups. Gold, *supra*, 96 *Yale L.J.* at 401. The ultimate decision whether Dr. Wagoner is qualified to render an opinion on the issue of specific causation must depend on the trial court's assessment of both his qualifications and his methodology.

Our resolution of the issue concerning the admissibility of the testimony of plaintiff's experts is consistent with *Rubanick v. Witco Chem. Corp., supra*, 125 *N.J.* 421, 593 *A.*2d 733, *Hake v. Township of Manchester*, 98 *N.J.* 302, 486 *A.*2d 836 (1985), and with opinions from other jurisdictions. In *Hake*, the plaintiffs offered the testimony of a trained first-aider to establish the lifesaving potential of cardiopulmonary resuscitation (CPR). We noted that "[w]hile the subject is ultimately medical in nature, all aspects of the subject are not within the exclusive knowledge of licensed practitioners," 98 *N.J.* at 314, 486 *A.*2d

836, and held that the plaintiffs should have been given the opportunity to demonstrate that their witness had "the minimal technical training and knowledge" required for him to express a reliable opinion, *id.* at 316, 486 *A.*2d 836. *See also State v. Frost,* 242 *N.J.Super.* 601, 616, 577 *A.*2d 1282 (App.Div.1990) (non-psychologist clinical director of women's resource center "eminently well qualified" to testify on battered-woman syndrome).

Courts of other jurisdictions also permit non-physician scientists to testify on matters of individual causation when their training and experience indicate sufficient expertise to support a reliable opinion. *See, e.g., In re Paoli R.R. Yard PCB Litig.,* 916 *F.*2d 829, 855–56 (3d Cir.1990) (toxicologist, microbiologist, and physicist, each with clinical or research experience), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1584, 113 *L.Ed.*2d 649 (1991); *Loudermill v. Dow Chem. Co.,* 863 *F.*2d 566, 570 (8th Cir.1988) (toxicologist with clinical experience); *Roberts v. United States,* 316 *F.*2d 489, 492–93 (3d Cir.1963) (industrial hygienist/toxicologist with practical experience); *Valiulis v. Scheffels,* 191 *Ill. App.*3d 775, 138 *Ill.Dec.* 668, 547 *N.E.*2d 1289, 1296–97 (1989) (clinical psychologist/neuropsychologist regularly consulted by physicians); *Nicholas v. City of Alton,* 107 *Ill.App.*3d 404, 63 *Ill.Dec.* 108, 437 *N.E.*2d 757, 760 (1982) (toxicologist/pharmacologist with practical experience); *Karasik v. Bird,* 98 *A.D.*2d 359, 470 *N.Y.S.*2d 605, 608 (1984) (pharmacologist); *see also* Black, *supra,* 56 *Fordham L. Review* at 661 ("Causation involves fundamentally scientific questions. As one writer puts it, 'the patient seeks relief, the physician tries to provide it, and the scientist seeks understanding' [quoting Lester S. King, *Medical Thinking* 131 (1982) ].").

-III-

■ Before the Appellate Division, plaintiff challenged the trial court's direction to proceed on strict liability only, in which event it would instruct the jury that defendants were deemed to

know of the danger of asbestos, or to proceed on both her strict liability and negligence claims, in which event defendants could attempt to prove the state-of-the-art defense to both claims.

Unfortunately, the parties failed to arrange for the entry of an order based on the trial court's ruling. Ordinarily, this failure would be fatal to an appeal. *See Credit Bureau Collection Agency v. Lind,* 71 *N.J.Super.* 326, 328–29, 177 *A.*2d 36 (App.Div.1961); *Homeowner's Taxpayers Ass'n v. South Plainfield Sewerage Auth.,* 60 *N.J.Super.* 321, 323, 158 *A.*2d 847 (App.Div.1960). Here, however, the parties are in apparent agreement on the trial court's ruling, and the matter is of importance to both plaintiffs and defendants in the trial of asbestos cases. Hence, we review the decision of the trial court as if an order had been entered. *See R.* 1:1–2; *Bitting v. Willett,* 47 *N.J.* 6, 9, 218 *A.*2d 859 (1966).

The Appellate Division laconically disapproved of the trial court's ruling, stating:

> Although we agree that the trial court erred in severing plaintiff's strict liability and negligence claims for trial, our disposition of this appeal would not be altered by the two claims having been tried together. The evidence of proximate cause would have been the same. [243 *N.J.Super.* at 462, 579 *A.*2d 1268.]

We granted defendants' cross-petitions seeking a determination whether the Appellate Division erred in its disapproval of the trial court's ruling.

Although the parties refer to the trial court's ruling as one for severance, the effect of the ruling was to compel plaintiff to elect between proceeding on a theory of strict liability that would not be subject to the state-of-the-art defense or on theories of both strict liability and negligence that would be subject to that defense. The court did not permit plaintiff to proceed first on strict liability and failing that, on negligence. Nor did it provide that if the two claims were severed for trial, the state-of-the-art defense would not apply to the strict liability claim.

The essence of plaintiff's strict liability claim is that defendants failed to provide adequate warnings of the dangerous propensities of asbestos during the period of decedent's exposure. Defendant Owens–Corning Fiberglass contends that in response to a 1964 scientific article demonstrating an association between asbestos insulation and a higher rate of cancer among asbestos workers, it placed a warning on its packages of asbestos. Defendant Celotex did not provide any warnings until 1972. In her negligence claim, plaintiff alleges that defendants were negligent in failing to inspect decedent's workplace to determine whether the proper equipment and procedures were employed by the workers handling asbestos.

To analyze the propriety of the trial court's order, we must review this Court's ten-year trek in the law of strict liability concerning asbestos cases. The journey begins with *Beshada v. Johns–Manville Products Corp., supra,* 90 *N.J.* 191, 447 *A.*2d 539. *Beshada* was a products liability case based on strict liability for the failure to warn of asbestos-related dangers, in which we ruled that manufacturers and distributors would be deemed to know of the dangers of asbestos products at the time of their manufacture. *Id.* at 204–05, 447 *A.*2d 539. In effect, *Beshada* abolished the state-of-the-art defense in asbestos cases. In reaching that result, we distinguished negligence and strict liability cases. Writing for the Court, Justice Pashman stated: "Essentially, state of the art is a negligence defense. It seeks to explain why defendants are not culpable for failing to provide a warning. * * * But in strict liability cases, culpability is irrelevant. The product was unsafe." *Id.* at 204, 447 *A.*2d 539. Accordingly, a defendant in a strict liability asbestos case could not rely on the state-of-the-art defense and claim it neither knew nor could have known that asbestos was dangerous. Thus, *Beshada* imposed liability on defendants for the failure to warn of dangers that were undiscoverable at the time of manufacture. The rationale for this result was that it would advance the goals of strict liability—

risk spreading, accident avoidance, and the simplification of fact-finding at trials. *Id.* at 205–08, 447 *A.*2d 539.

Subsequently, in *Feldman v. Lederle Laboratories*, 97 *N.J.* 429, 455, 479 *A.*2d 374 (1984), we clarified *Beshada* by limiting the abolition of the state-of-the-art defense to asbestos cases. Then, in *Fischer v. Johns–Manville Corp.*, 103 *N.J.* 643, 512 *A.*2d 466 (1986), we further clarified *Beshada* by holding that a defendant's knowledge, or state of knowledge, although inadmissible on a claim for compensatory damages on a theory of strict liability, could be admissible on a claim for punitive damages. The rationale was that claims for punitive damages depend on proof of the defendant's knowledge and conduct. As we stated, "strict products liability proofs center on the product; punitive damages proofs center on a defendant's conduct." *Id.* at 655, 512 *A.*2d 466. Thus, we held that "in a strict-liability failure-to-warn case involving exposure to asbestos or asbestos products, plaintiffs are not precluded from introducing evidence relating to defendants' knowledge or conduct as it may be relevant to other aspects of the case, including punitive damages." *Id.* at 656, 512 *A.*2d 466.

The defendant in *Fischer* argued that one of the reasons for the *Beshada* holding was that the elimination of the state-of-the-art defense would simplify matters for the jury. This purpose, so the defendant argued, would not be served by denying proofs of the defendant's misconduct on the strict liability aspect of the case while allowing those proofs on the claim for punitive damages. We rejected that argument, stating:

Presumably the fear is that jurors will be unable in their evaluation of the strict liability claim to disregard whatever evidence there may be of defendant's misconduct, and hence will be unable to return a fair verdict. The fear is unfounded. Our faith in the jury system is greater than the argument suggests. Juries are often called on to consider alternative theories and to conduct deliberations in stages, as when given interrogatories or a special verdict sheet. We are confident that a careful charge, clearly explaining the elements necessary for each finding, can assist juries in reaching fair verdicts on both the liability phase and, should they reach the question, punitive

damages in a failure-to-warn, strict products liability case. [*Id.* at 659, 512 *A.*2d 466 (citation omitted).]

Like the defendant in *Fischer*, defendants here contend that allowing the introduction of conduct-oriented proofs will confuse the jury. We remain persuaded, however, as we were in *Fischer*, that trial courts, through careful instructions and special verdicts, can control the risk of jury confusion. Furthermore, we are unpersuaded by defendants' arguments that we violate principles of equal protection and due process by permitting plaintiff to proceed on theories of both strict liability and negligence. We are aware that the United States Court of Appeals for the Third Circuit found "the *Fischer* case troubling." *In re Asbestos Litig.*, 829 *F.*2d 1233, 1244 (3d Cir.1987), *cert. denied*, 485 *U.S.* 1029, 108 *S.Ct.* 1586, 99 *L.Ed.*2d 901 (1988). Troubled as it was by the potential impairment of simplified jury trials through the admission of the defendant's conduct on punitive damages, the court sustained the constitutionality of the abolition of the state-of-the-art defense to strict liability claims in asbestos cases. 829 *F.*2d at 1244.

■ On remand, the trial court should not require plaintiff to elect between proceeding on either negligence or strict liability theories. Plaintiff may proceed on both claims. If plaintiff elects to proceed on her strict liability claim, the state-of-the-art defense will not apply and plaintiff need not show that defendants knew or should have known that asbestos was dangerous. If plaintiff also proceeds on a negligence theory, her negligence claim will be subject to the state-of-the-art defense.

–IV–

Following the original oral argument, we directed the parties to brief the issue of causation in toxic-tort cases. Pursuant to that direction, the parties submitted supplemental briefs and reargued the case. On further consideration, we have decided not to address the issue on the record before us.

The trial court's dismissal of the complaint flowed directly from the court's exclusion of Dr. Wagoner's testimony and its conclusion that Dr. Sokolowski's testimony was a net opinion. Without the testimony of these witnesses, plaintiff's case was devoid of proof of causation. Because the directed verdict was the inexorable result of the evidentiary rulings, our disposition of them requires that the directed verdict be set aside. *See In re Paoli R.R. Yard PCB Litig., supra,* 916 *F.*2d at 835.

The judgment of the Appellate Division is reversed, and the matter is remanded to the Law Division.

*For reversal and remandment—*

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, O'HERN, POLLOCK, GARIBALDI and STEIN— 7.

*Opposed*—None.