NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5623-14T3

GAIL KROSS,

 Plaintiff-Appellant,

v.

GARY BRESLOW, M.D.,

 Defendant-Respondent.

__________________________________________

 Argued October 26, 2016 – Decided October 4, 2017

 Before Judges Simonelli and Gooden Brown.

 On appeal from the Superior Court of New
 Jersey, Law Division, Essex County, Docket No.
 L-9734-10.

 Alan Berliner argued the cause for appellant
 (Rothenberg, Rubenstein, Berliner & Shinrod,
 LLC, attorneys; Mr. Berliner, on the brief).

 Evelyn C. Farkas argued the cause for
 respondent (Farkas & Donohue, LLC, attorneys;
 Ms. Farkas, of counsel; Meredith E. Traina,
 on the brief).

 The opinion of the court was delivered by

GOODEN BROWN, J.A.D.
 In this medical malpractice case, plaintiff Gail Kross

appeals from an August 11, 2015 Law Division order granting

defendant Dr. Gary Breslow's motion for a directed verdict and

dismissing her complaint with prejudice. Plaintiff contends that

the trial judge erred in barring the testimony of her sole

liability expert, Richard Marfuggi, M.D., a board certified

plastic surgeon, on the ground that Dr. Marfuggi's opinion amounted

to an inadmissible net opinion. Based on our review of the record

under the applicable legal principles, we affirm.

 I.

 We recount the facts and procedural history presented in the

record. On August 2, 2006, plaintiff, who was then fifty-seven

years old, underwent an abdominoplasty (tummy tuck),1 as well as

1
 According to the American Society of Plastic Surgeons, a complete
tummy tuck or abdominoplasty is a surgical procedure performed
under general anesthesia

 to flatten the abdomen by removing excess skin
 and fat from the lower abdominal region and
 tightening the muscles of the abdominal wall.
 . . . [T]he surgeon generally makes a long
 incision from hip to hip, just above the pubic
 region. A second incision releases the navel
 from surrounding tissue. The surgeon
 separates the skin from the abdominal wall up
 to the ribs, lifts the skin flap, and tightens
 the abdominal muscles by pulling them closer
 together and stitching them into position.
 Excess skin is removed from the flap and a new

 2 A-5623-14T3
liposuction of the sides of her abdomen, performed by Dr. Berman,

a non-party to this action. Plaintiff was unhappy with the results

and had difficulty healing. Plaintiff complained to Dr. Berman

that her "incisions[] became red and painful[,]" "her abdomen was

tight[,] [s]he couldn't stand straight[,]" and "[s]he was in

constant pain[.]" Dr. Berman treated plaintiff with steroid

injections, a common treatment for thickened or painful scarring,

but the injection therapy was unsuccessful.

 About a year later, in June and July of 2007, Dr. Berman

performed two scar revisions, which are superficial excisions of

the scar performed under local anesthesia, and treated plaintiff

with a second round of steroid injections. However, the procedures

failed to improve the appearance of plaintiff's scars, which had

developed keloids.2 Subsequently, plaintiff wrote to Dr. Berman,

 hole cut for the navel, which is then stitched
 into place before the incisions are closed.

 [Tummy Tuck (Abdominoplasty), Am. Soc'y of
 Plastic Surgeons,
 https://www.plasticsurgery.org/for-medical
 professionals/resources-and-
 education/publications/physicians-guide-to-
 cosmetic-surgery/body-contouring-surgical-
 procedures-physician%E2%80%99s-
 guide?sub=Tummy+Tuck+(Abdominoplasty) (last
 visited Sept. 25, 2017).]
2
 According to Dr. Marfuggi, "keloid scarring is a thickening of
a scar . . . beyond the margins of the initial wound."

 3 A-5623-14T3
indicating that she remained dissatisfied with the appearance of

her scars and that her complications persisted. Dr. Berman

refunded plaintiff $14,000 in exchange for a signed release barring

any future claims attributable to his care.

 In December 2007, plaintiff consulted with a second plastic

surgeon, Dr. Giampapa. To improve the appearance of the scars and

alleviate her other complaints, Dr. Giampapa proposed a "two-part"

procedure, involving the "insertion of tissue expanders as a first-

stage operation" to "allow the skin to stretch," and then a second

procedure called a "V-Y flap revision" to address her complaints

stemming from the tummy tuck. Dr. Giampapa indicated that

plaintiff's skin was under too much tension, meaning "there was

not enough skin present or . . . too tight a skin envelope" to

perform the procedure without the use of tissue expanders.

However, plaintiff did not proceed with Dr. Giampapa's proposed

procedures.

 Instead, on May 9, 2008, plaintiff sought treatment from Dr.

Breslow. After examining plaintiff, Dr. Breslow "noted the

presence of hypertrophic scarring, which [were] scars that had

widened," but "made no mention of the tightness of the skin" or

the need for a more invasive two-stage procedure. Instead, Dr.

Breslow recommended a less invasive "in-office scar revision[,]"

which plaintiff underwent on June 4, 2008. The procedure involved

 4 A-5623-14T3
"cutting out the existing scar under local anesthesia and sewing

that together using . . . nylon sutures, around the umbilicus, and

. . . a dissolving barbed suture in the lower abdomen" in order

to revise "both the umbilical scar . . . around [plaintiff's]

bellybutton, and the transverse scar . . . that ran across the

lower portion of [her] abdomen." The scar revision was performed

without complications. However, post-operatively, plaintiff

received "a series of low[-]dose radiation treatments[,]" as well

as a steroid injection "to prevent the recurrence of [the]

keloid[.]"

 Throughout the summer and fall of 2008, plaintiff returned

to Dr. Breslow for several follow-up appointments. In June,

plaintiff complained of "abdominal discomfort, abdominal

distention, vaginal irritation, and tightness of the lower

abdomen." Dr. Breslow thought plaintiff's complaints were

"secondary" to the radiation therapy and referred her to Dr.

Ahlborn, who diagnosed her with an umbilical hernia. In December

2008, during plaintiff's last visit with Dr. Breslow, he advised

her it would take "up to three years for total healing to take

place, and that this was partially the cause of her complaints."

Nonetheless, Dr. Breslow suggested that further revision

procedures were possible, "both for the umbilicus and for the

abdominoplasty."

 5 A-5623-14T3
 Thereafter, plaintiff sought the opinion of several other

surgeons. On September 8, 2009, Dr. Boss examined plaintiff and

noted "a loss of continuity of the umbilicus, meaning that the

umbilicus was no longer attached as it had originally been[,]"

separation of the abdominal muscles, and "a hernia around the

umbilicus." Dr. Boss also found that plaintiff's "vagina had been

displaced anteriorly and superiorly[,]" meaning "the tissue on the

sides of [her] vagina, had been pulled upward."

 In April 2010, a second doctor, Dr. Zubowski, made similar

findings. Dr. Zubowski noted "the presence of a poorly defined

umbilicus[,]" meaning that plaintiff's "umbilicus . . . had been

replaced with a new scar." Dr. Zubowski also noted the "laxity

or looseness of the upper abdominal musculature" and that

plaintiff's "lower abdominal scar, had spread, [and] that it was

firm and tender" to the touch.

 In May 2010, plaintiff sought the opinion of a third

physician, Dr. Margiotta, who indicated that plaintiff had a "tight

intraumbilical envelope, elevated mons,3 and wide scarred

umbilicus." In other words, plaintiff's "skin from the bellybutton

down to the vagina was noted to be tight," "the tissue on the side

of the vagina, had been elevated or pulled superiorly," and "the

3
 Dr. Marfuggi testified that the mons "is the area in the pubic
hairline[.]"

 6 A-5623-14T3
umbilicus itself had spread[.]" Like Dr. Giampapa, Dr. Margiotta

recommended a revision of plaintiff's abdominoplasty to "repair

the stretching of the abdominal muscles" and the use of "tissue

expanders to stretch the skin" before performing a scar revision.

 On September 15, 2010, prior to filing the lawsuit, plaintiff

was examined by Dr. Marfuggi. Plaintiff complained "her vaginal

area was easily irritated," particularly when wearing constricting

clothing, and "sexual activity was not possible due to pain[.]"

She had difficulty "sitting for prolonged periods of time," as

well as trouble sleeping and urinating. She also complained of

"gastrointestinal problems, . . . spasms after eating, cramping,

bloating," and "stress incontinence[.]" She "believed she had an

umbilical hernia" and stated "she no longer had a bellybutton."

 Based on his examination, Dr. Marfuggi found "an absence of

umbilical tissue and a prominence of scar" tissue. He noted

plaintiff's umbilicus had been converted to a vertical oval,

suggesting abdominal tension in the lower region "pulling it

inferiorly or down." Dr. Marfuggi also reported that the center

of plaintiff's abdominal incision was "very dark and wide[,]" a

condition known as "scar hypertrophy" or hyperpigmentation. Dr.

Marfuggi added that the scar along plaintiff's "pubic hairline

ha[d] been flattened and rotated superiorly or up."

 7 A-5623-14T3
 During the examination, Dr. Marfuggi photographed plaintiff's

abdomen, "including the area of her scars from the abdominoplasty

and the scar revision." Plaintiff also provided a photograph of

her incision taken in 2006 after Dr. Berman's abdominoplasty.

Comparing both photographs, Dr. Marfuggi indicated that in the

2006 photo, plaintiff's scar was "transverse, very red[,]" and

consistent with her complaints. Dr. Marfuggi also noted that the

2006 photograph showed "significant . . . distance between the

scar and the pubic hairline," and that plaintiff's umbilicus was

"distorted" and "converted to an oval that is pulled in a

north/south direction[.]" In addition, "[t]he scar in 2006 [was]

asymmetric[,]" with the left side of plaintiff's scar appearing

lower than the right.

 On November 9, 2010, plaintiff filed a complaint against Dr.

Breslow and unnamed fictitious defendants in connection with the

June 2008 scar revision. Plaintiff alleged Dr. Breslow "failed

to possess the degree of knowledge ordinarily possessed and

exercised by others in the . . . profession of plastic surgery[,]

. . . did negligently and careless[ly] treat" her, and caused her

to "sustain severe and permanent injuries to her abdomen and other

parts of her body." On January 24, 2011, Dr. Breslow filed a

contesting answer, including a demand for an affidavit of merit,

pursuant to N.J.S.A. 2A:53A-27, and answers to interrogatories.

 8 A-5623-14T3
On June 11, 2012, plaintiff amended her answers to interrogatories

to identify Dr. Marfuggi as her sole liability expert in the field

of plastic surgery.

 During the discovery period, Dr. Marfuggi authored a written

report and submitted to depositions, including two videotaped de

bene esse depositions on June 5, 2014 and March 17, 2015, in lieu

of a court appearance. See R. 4:14-9. Dr. Marfuggi opined that

Dr. Breslow deviated from the standard of care in his treatment

of plaintiff. Dr. Marfuggi testified that, before performing the

scar revision, Dr. Breslow did not adequately consider "the

deficiency of skin or tightness of the skin in [plaintiff's] lower

abdominal area" documented by Drs. Giampapa and Margiotta and

depicted in plaintiff's 2006 photograph. Dr. Marfuggi explained

that

 when a scar revision is done, the ideal
 situation is to remove the cutout, the
 existing scar, and sew the two unscarred sides
 together without tension. And if there is
 tension to begin with, that is if there
 already is a tightness in the area, simply
 cutting out the scar and sewing the sides
 together would pull the incision together
 under even more tension, and this causes a
 distortion of the skin that is pulling things
 either down or up, and also increases the
 chances of having an undesirable scar result.

Dr. Marfuggi concluded that Dr. Breslow's alleged deviation from

the standard of care directly caused "distortion of [plaintiff's]

 9 A-5623-14T3
anatomy," specifically, deformity of the umbilicus "into a

vertical oval," and "superior rotation" of the skin in plaintiff's

pubic area caused by the tightness of "the lower abdominal skin[.]"

 While her case was pending, plaintiff consulted Dr. Pyo to

address the complications she attributed to Dr. Breslow's June

2008 procedure. On October 8, 2014, Dr. Pyo performed abdominal

wall reconstruction surgery to lower plaintiff's previous

incision, release the tension on the skin, restore the pubic

anatomy, and repair the umbilical hernia. Dr. Pyo's operative

report indicated that by performing a dissection, he "was able to

pull . . . the skin down . . . a little bit under one inch." Once

"the fascial defect was closed[,]" plaintiff had "significant

laxity of the abdominal wall." However, after her "pubic tissues

and the tissues of the mons . . . were released," Dr. Pyo had

"some concern about the tension of the abdominal skin flap and

[its] ability to maintain the lower position" and avoid plaintiff's

original problem. As a result, Dr. Pyo used Mitek anchor sutures

to stabilize the new incision line and avoid "upward

displacement[.]" Notably, he did not use tissue expanders or new

skin during the procedure, as he found significant laxity of the

abdominal wall.

 Following Dr. Pyo's reconstruction surgery, Dr. Marfuggi

examined plaintiff for a second time on January 7, 2015, to assess

 10 A-5623-14T3
any improvement in her condition from the surgery. Following his

examination, Dr. Marfuggi authored an addendum report, the

contents of which he testified to during the March 17, 2015

deposition. Plaintiff told Dr. Marfuggi that the reconstruction

surgery alleviated almost all of her symptoms. Dr. Marfuggi

confirmed that plaintiff's "whole lower abdomen was less tight and

. . . appeared in a more natural position" as a result of the

surgery. According to Dr. Marfuggi, this new information confirmed

his prior opinion.

 On July 27, 2015, the parties appeared for trial. At the

outset, defendant moved in limine to bar Dr. Marfuggi's testimony

asserting that he rendered a net opinion, the exclusion of which

would warrant a directed verdict in defendant's favor. After

reviewing Dr. Marfuggi's deposition testimony and entertaining

oral argument, the trial court granted defendant's motion. The

court reasoned that Dr. Marfuggi's testimony constituted a net

opinion because it did not establish a causal connection between

plaintiff’s physical injuries and Dr. Breslow's alleged deviation.

Finding that plaintiff could not "sustain her burden of proof

without . . . the expert opinion[,]" the court granted defendant's

motion for a directed verdict and dismissed the complaint with

prejudice. The court entered a memorializing order on August 11,

2015, and this appeal followed.

 11 A-5623-14T3
 II.

 Plaintiff argues that the court erred in barring Dr.

Marfuggi's testimony as a net opinion. We note, at the outset,

that "[t]he admission or exclusion of expert testimony is committed

to the sound discretion of the trial court." Townsend v. Pierre,

221 N.J. 36, 52 (2015). We apply a "deferential approach to a

trial court's decision to admit [or exclude] expert testimony,

reviewing it against an abuse of discretion standard." Pomerantz

Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011). An

abuse of discretion "arises when a decision is made without a

rational explanation, inexplicably departed from established

policies, or rested on an impermissible basis." Flagg v. Essex

Cty. Prosecutor, 171 N.J. 561, 571 (2002).

 N.J.R.E. 702 and N.J.R.E. 703 frame our analysis regarding

the admissibility of expert testimony. The former requires that

the expert be qualified in his or her respective field to offer

testimony that "will assist the trier of fact to understand the

evidence or to determine a fact in issue[.]" N.J.R.E. 702. The

latter addresses the foundation for expert testimony. N.J.R.E.

703. The rule mandates that expert opinions "be grounded in 'facts

or data derived from (1) the expert's personal observations, or

(2) evidence admitted at the trial, or (3) data relied upon by the

expert which is not necessarily admissible in evidence but which

 12 A-5623-14T3
is the type of data normally relied upon by experts.'" Townsend,

supra, 221 N.J. at 53 (quoting Polzo v. Cty. Of Essex, 196 N.J.

569, 583 (2008)).

 "The net opinion rule is a 'corollary of [N.J.R.E. 703]

. . . which forbids the admission into evidence of an expert's

conclusions that are not supported by factual evidence or other

data.'" Townsend, supra, 221 N.J. at 53-54 (quoting Polzo, supra,

196 N.J. at 583). "The rule requires that an expert 'give the why

and wherefore' that supports the opinion, 'rather than a mere

conclusion.'" Id. at 54 (quoting Borough of Saddle River v. 66

E. Allendale, LLC, 216 N.J. 115, 144 (2013)). To satisfy the net

opinion rule, experts must "be able to identify the factual bases

for their conclusions, explain their methodology, and demonstrate

that both the factual bases and the methodology are reliable."

Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417

(1992)). In contrast, an expert's conclusion must be "excluded

if it is based merely on unfounded speculation and unquantified

possibilities." Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super.

563, 580 (App. Div.), certif. denied, 154 N.J. 607 (1997)). Given

the weight accorded to expert testimony, "a trial court must ensure

that an expert is not permitted to express speculative opinions

or personal views that are unfounded in the record[,]" or an

 13 A-5623-14T3
"opinion that is unsupported by the factual record or . . .

contradicts that record." Ibid.

 Based on our review of the record, we discern no abuse of

discretion in the court's decision to bar Dr. Marfuggi's expert

testimony. Dr. Marfuggi relied on the records of Dr. Giampapa and

Dr. Margiotta, photographs of plaintiff's incision, as well as his

own examination of plaintiff to support his conclusion that there

was insufficient laxity for Dr. Breslow to perform the 2008 scar

revision. However, as the court correctly concluded, Dr.

Marfuggi's testimony failed to establish the "causal connection"

between plaintiff's complaints and the treatment rendered by Dr.

Breslow.

 Dr. Marfuggi did not provide any objective criteria for

concluding that Dr. Breslow failed to consider the laxity of

plaintiff's skin, nor specific factual or methodological bases to

sustain his conclusion that Dr. Breslow's minor scar revision

directly caused plaintiff's substantial and prolonged

complications. We agree with the court that Dr. Marfuggi's

testimony was no more than "a bare conclusion without establishing

the [why and wherefore] to connect . . . [Dr. Breslow's] procedure

with the injuries suffered[,] and his conclusion that the deviation

occurred when [Dr. Breslow] failed to consider the tightness of

the skin."

 14 A-5623-14T3
 Acknowledging that this was not "your classic net opinion

case[,]" the court construed plaintiff's position as attributing

her complaints to the procedure performed by Dr. Breslow, rather

than Dr. Breslow's procedure failing to alleviate her complaints.

The court determined that Dr. Marfuggi's reliance on Dr. Giampapa's

and Dr. Margiotta's records involving more invasive procedures to

establish a deviation on the part of Dr. Breslow was misplaced.

The court explained:

 There is no connection in anything that
 Dr. Marfuggi says about observations of the
 lack of tissue to . . . establish that there
 was a problem with tissues in doing . . . a
 revision of just the scar internally.

 In other words, for Dr. Marfuggi to rely
 upon the statements exacted from a record in
 dealing with recommendations of major
 procedures to suggest that that's the
 foundation for his opinion as it relates to
 this minor excision[,] I think is not
 something that is supported by [the] factual
 record.

 . . . [N]othing that I read in his
 transcript . . . develop[s] that in such a
 way. There's no language that says well,
 . . . if that's the case then the fact that
 you do this minor surgery is enough to create
 this sort of problem, these same sorts of
 issues that she's suffering here.

 . . . [H]e has not pointed to facts that
 are contained in the record upon which he
 could rely to formulate the opinion that he
 did.

 15 A-5623-14T3
 We acknowledge, as did the court, that Dr. Marfuggi's

testimony was "confusing at times and appear[ed] to be internally

inconsistent[.]" As an example, the court pointed out that while

Dr. Marfuggi relied heavily on the photographs to support his

opinion, at other times, he retreated from that position. The

following colloquy between defense counsel and Dr. Marfuggi

highlights one such instance:

 Q: Would you agree that skin laxity or
 looseness is determined by a pinch test or
 something similar to that and not one picture?

 A: Yes.

 Q: Okay. So fair to say that you could not
 determine whether or not there was laxity or
 not, based on the photograph taken in 2006.
 Correct?

 A: Yes. I believe I testified to that fact
 already, yes.

 . . . .

 Q: Okay. But you would agree that th[e]
 photograph, 2006, can't be a determinant as
 to whether or not there was laxity prior to
 Dr. Breslow's surgery. Correct?

 A: The photo cannot, correct.

 Nonetheless, upon being shown one of Dr. Breslow's

photographs of plaintiff's incision taken after Dr. Breslow's scar

revision on June 12, 2008, Dr. Marfuggi agreed that there was

apparent laxity:

 16 A-5623-14T3
 Q: And that shows the abdominal incision
 completely intact. Correct?

 A: Yes.

 Q: And you would agree with me that th[e]
 incision appears to be under no tension
 correct?

 A: That's correct.

Later, when challenged on whether Dr. Breslow's scar revision

procedure had caused plaintiff's "subjective symptoms[,]" relying

on a comparison between plaintiff's 2006 photograph and his 2015

photograph, Dr. Marfuggi responded "I cannot come up with any

other alternative to the cause of [plaintiff's] deformities and

complaints than that too much skin was taken out or skin was taken

out under too much tension[.]"

 Further, in addition to relying on the photographs, Dr.

Marfuggi based his opinion on Dr. Giampapa's and Dr. Margiotta's

records referring to the use of tissue expanders to increase

laxity. However, Dr. Marfuggi acknowledged that the procedures

contemplated by Drs. Giampapa and Margiotta were more invasive

than a scar revision procedure. When cross-examined about the

invasiveness of Dr. Breslow's scar revision procedure, which Dr.

Marfuggi agreed was a "superficial excision[,]" the following

colloquy occurred:

 Q: With a scar revision, you are removing the
 scar from the layer of skin. Correct?

 17 A-5623-14T3
 A: That can be done. You have to understand
 one can do a scar revision all the way through
 all of the tissues. In other words, the muscle
 could be scarred. The fascia could be
 scarred.

 Q: Understand, but that's not what we are
 talking about here - -

 A: Correct.

 Q: - - as far as what Dr. Breslow did. Right?

 A: That's correct.

 Q: Okay. So as far as what Dr. Breslow did,
 he didn't . . . go into the fascia layers.
 Correct?

 A: I don't know the answer to that, whether
 he went into the fascia layers, but he
 certainly at least went to the fascia layers.

 Q: Where do you get any information that Dr.
 Breslow may have gone into the fascia layers?

 A: I didn't say that he did.

 Q: Okay. So sitting here today, you are well
 aware that Dr. Breslow's revision procedure
 did not go into the fascia layers. Correct?

 A: I can't say that it did or did not.

Later, Dr. Marfuggi again reversed his testimony:

 Q: . . . And based on your review of the
 materials in this case, the scar tissue was
 removed from the skin layer and not anything
 deeper. Correct?

 A: Yes.

 18 A-5623-14T3
Notably, Dr. Marfuggi also admitted that plaintiff "[c]ould . . .

have developed [her] symptoms in 2006" from Dr. Berman's surgery.

 Finally, in reviewing a directed verdict, this court "employs

the same standard on review as the trial court did in deciding

defendant's motion for a directed verdict." Luczak v. Twp. Of

Evesham, 311 N.J. Super. 103, 108 (App. Div.), certif. denied, 156

N.J. 407 (1998). Indeed, a court should only deny a motion for

directed verdict "'if the evidence, together with the legitimate

inferences therefrom, could sustain a judgment in [the non-

movant]'s favor.'" Sackman v. N.J. Mfrs. Ins. Co., 445 N.J. Super.

278, 291 (App. Div. 2016) (quoting Edwards v. Walsh, 397 N.J.

Super. 567, 571 (App. Div. 2007)); see also R. 4:37-2(b). Here,

we find no basis in the record to reverse the court's grant of

defendant's motion for a directed verdict once plaintiff's expert

testimony was excluded.

 Affirmed.

 19 A-5623-14T3