**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0133-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RAHEEM J. JACOBS,

     Defendant-Appellant.

_____

Argued November 12, 2024 – Decided December 23, 2024

Before Judges Sabatino, Gummer, and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 17-08-0743.

Robert N. Agre, argued the cause for appellant (Agre & St. John, attorneys; Robert N. Agre, on the briefs).

David M. Galemba, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; David M. Galemba, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Raheem Jacobs was found guilty of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), as a lesser-included offense of murder, in connection with the fatal shooting of Keon Butler. He was acquitted of other charges. The trial court sentenced him to a twenty-year custodial term, subject to the minimum parole ineligibility period of the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2.

Briefly stated, defendant allegedly was in a red car that was following a minivan being driven by Butler. Gunshots were fired from the red car towards the minivan. Most of those shots hit the lower portion of the rear of the minivan. However, one shot struck Butler in the head, killing him.

There were no testifying eyewitnesses, nor any video recordings, that placed defendant at the scene of the shooting. Instead, the State relied on statements indicative of his involvement in the shooting that a friend and former girlfriend claimed defendant had made to them—which they provided under oath in police interviews but later recanted at trial. The State also relied upon the expert testimony of an FBI agent, who opined that, at the time of the shooting, defendant's cell phone had passed through cell tower zones near the crime scene.

A-0133-22

In this direct appeal, defendant presents the following arguments for our consideration:

POINT I

THE VERDICT ENTERED BY THE JURY WAS AGAINST THE WEIGHT OF THE EVIDENCE

POINT II

THE TRIAL COURT ERRED BY CHARGING THE JURY AS TO WHAT IT BELIEVED WAS THE LESSER-INCLUDED OFFENSE OF RECKLESS MANSLAUGHTER OVER THE OBJECTION OF BOTH COUNSEL

POINT III

THE COURT ERRED IN ALLOWING THE JURY TO CONSIDER THE TESTIMONY OF THE STATE'S EXPERT, JOHN HAUGER, WHO WAS NOT NAMED BY THE STATE UNTIL THE DAY PRIOR TO JURY SELECTION

POINT IV

THE COURT ERRED IN ALLOWING THE REDACTED OUT OF COURT STATEMENTS OF ERICA JACKSON AND ORDALE TELFAIR TO BE READ TO THE JURY

POINT V

THE EXTENDED TERM SENTENCE IMPOSED BY THE TRIAL COURT WAS EXCESSIVE AND CONSTITUTED AN ABUSE OF DISCRETION

3

POINT VI

THE CHARGES AGAINST APPELLANT SHOULD BE DISMISSED AS A RESULT OF PROSECUTORIAL MISCONDUCT THAT OCCURRED IN THE PRESENTATION TO THE GRAND JURY BUT WHICH ONLY BECAME EVIDENT DURING THE TRIAL TESTIMONY OF JOHN RILEY (NOT RAISED BELOW)

Having considered these arguments in light of the record and the applicable law, we affirm.

I.

In the early morning hours of August 11, 2015, Butler was shot and killed while driving a minivan in Bridgeton. Before the shooting, Butler had reached out to a friend and arranged to pick her up from her home. After picking up the friend in his minivan, Butler noticed that a red car was following behind them. When he tried to speed up and get away from that car, he was struck in the head by a nine-millimeter bullet. Butler's minivan crashed into a utility pole. After the red car drove off, Butler's friend was able to get out of the crashed minivan and make her way to the hospital.

Based on Sprint cell phone records, the State contended that a cell phone number assigned to defendant was used around the sectors of the cell tower in center city Bridgeton around the time that Butler was killed. The State presented

4

expert testimony from Special FBI Agent John Hauger in support of that contention. Hauger was a member of the FBI's Cellular Analysis Survey Team ("CAST"). He testified that, as a member of CAST, he used Sprint's per call measurement data ("PCMD")[1] to "locate a phone in real time" and to "give a general geographic area as to where [a] phone was."

Hauger testified that PCMD yielded information about the tower sector in which a cell phone was located. It generated that tracking information by applying a proprietary formula for calculating "how far a phone is from [a] tower." Hauger acknowledged that Sprint issued a disclaimer about PCMD records, which advised that "they're not vouching for the accuracy of the information contained in it."

The State also introduced two out-of-court statements: one from a friend of defendant and another from his paramour. Both statements indicated that defendant had participated in the homicide. The first such statement was by Ordale Telfair. Detective James Riley testified that on August 21, 2015, the Bridgeton Police Department contacted him and told him that Telfair wanted to

---

[1] According to Hauger's trial testimony, PCMD is "a separate system that the Sprint engineers use to optimize their network to troubleshoot different complaints that a customer may have. Basically[,] what it shows is the tower that a phone uses and the estimated distance that the phone was from the tower."

provide information about Butler's shooting. Telfair was at the police station because he had been arrested on an outstanding warrant. Riley went to the station and interviewed Telfair. Riley testified that he did not make any promises to Telfair to make his statement.

In a recording of the interview played for the jury, Telfair told Riley that on the night of the crime Butler, known to him as "Smash," had dropped off a man named "Che" while Telfair was at the Bridgeton Villas apartment complex. Telfair stated he then got into the car with Butler and they drove to a convenience store. According to Telfair, while at the store, he saw a "smoke gray color Impala," and Butler, who had also seen the Impala, asked him who was in the vehicle. Telfair told Butler that he did not know. He then left Butler and walked back to the apartment complex, where he heard Butler's voice talking over Che's speaker phone. Shortly thereafter, Telfair heard gunshots over the phone.

Telfair recounted that defendant had called later in the day looking for a man named Shumar Cotto, whom Telfair was with at the time, and that defendant had asked for ".40 and [.]9 bullets." Telfair explained to Riley that defendant did not provide any context for his statement, but that Telfair had deduced it was in relation to Butler's shooting. Telfair stated he brought defendant the

6

requested bullets. Telfair also told Riley that defendant made comments about "head shots," which Telfair suggested meant "I don't miss."

Contrary to his police interview, Telfair testified at trial that he had not talked to Butler or Che on the night Butler was killed and that he had not met defendant. Telfair claimed he had lied to the police "because that's what they wanted to hear." He alleged that police officers "had it out for [defendant]. They kept asking me different questions about him and kept threatening me with fake charges." Telfair claimed he had been harassed by officers several times.

The second hearsay declarant was Erica Jackson, defendant's paramour at the time of Butler's death. On March 29, 2016, Detective Riley and State Police Sergeant Glenn Garrells interviewed Jackson, after asking her if she would come to the station with them.

In the video recording of her interview presented to the jury, Jackson stated that defendant had called her crying on the night of Butler's shooting and told her he had "so much revenge . . . in his mind," and that "everyone was against him." She also told Riley and Garrells that defendant often talked about how "[h]e was going to put a .40 [caliber bullet] in somebody." Jackson further stated that she had heard information that suggested that defendant killed Butler and "that the cops traced all the stuff down to [defendant]. They found the gun.

They had his phone. They [had] see[n] him on camera going through the light. They had the girl['s] car." Jackson did not reveal the source of this information.

At trial, Jackson testified she did not recall anything that she had told detectives in her recorded interview, including her conversation with defendant after Butler's death. She claimed, for the first time, that she had problems with memory loss due to medicine she took to manage her mental health.

In addition, the State presented video evidence that showed a red vehicle in pursuit of Butler's minivan before shots were fired. The State also moved into evidence several photos of the scene after Butler's shooting. Among other things, the photos depicted the following: a blown-out middle window on the driver's side of the minivan, a bullet hole entry near the driver's side rear wheel, a trajectory rod in the driver's side rear tire, a trajectory rod in the passenger side rear tire, bullet entries in the rear passenger side of the vehicle, and a bullet strike through the driver's side headrest.

The jury acquitted defendant of murder and various gun possession charges. However, the jury found him guilty of the lesser-included offense of second-degree reckless manslaughter. The court imposed an extended term twenty-year NERA sentence upon defendant, a persistent offender.

This appeal followed.

II.

We address the issues on appeal by first discussing the two points that defense counsel chose to focus on during the appellate oral argument: (1) the jury instruction that the trial court issued, sua sponte, on manslaughter; and (2) the admission of Special Agent Hauger's expert testimony on cell tower analysis.

A.

Defendant contends the trial court erred by instructing the jury on the lesser-included offenses of aggravated[2] and reckless manslaughter. We reject his contention and, in fact, commend the trial judge for including this jury charge, sua sponte, based on the evidence that emerged at trial.

The applicable law is well-established. As our Supreme Court has repeatedly made clear, "[j]ury instructions for lesser-included offenses are reviewed under a standard that examines whether 'a rational basis' exists 'for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense.'" State v. Fowler, 239 N.J. 171, 187–88 (2019) (quoting State v. Funderburg, 225 N.J. 66, 81 (2016)). Furthermore, if, as here, "the parties do not request a lesser-included-offense charge,

---

[2] The jury did not convict defendant of the aggravated form of manslaughter, instead choosing to find him guilty of reckless manslaughter.

reviewing courts 'apply a higher standard, requiring the unrequested charge to be "clearly indicated" from the record.'" Id. at 188 (quoting State v. Alexander, 233 N.J. 132, 143 (2018)).

A trial judge "has an independent obligation to instruct on clearly indicated lesser-included offenses even if the defendant objects." State v. Simms, 369 N.J. Super. 466, 471 (App. Div. 2004) (citing State v. Jenkins, 178 N.J. 347, 361 (2004)). In applying this "clearly indicated" standard, "the court must not consider 'the credibility of the witnesses' or the 'worth' of the evidence; rather, it must look only to the 'existence of evidence to support the lesser included offense [charge].'" State v. Canfield, 252 N.J. 497, 501 (2023) (alteration in original) (quoting State v. Canfield, 470 N.J. Super. 234, 289 (App. Div. 2022)). As it is often said, the court must give a jury charge sua sponte when the evidence to justify that charge is "jumping off the page." Ibid. (quoting Funderburg, 225 N.J. at 81–82); see also State v. Denofa, 187 N.J. 24, 42 (2006).

A related principle is that our appellate courts will not overturn convictions founded on jury instructions that were objected to and given at trial if the instructions amounted to harmless error. State v. Cooper, 256 N.J. 593, 607 (2024). "To show that an error was not harmless, the proponent of the objection must establish 'some degree of possibility that [the error] led to an

unjust result.'" Id. at 607–08 (alteration in original) (quoting State v. Baum, 224 N.J. 147, 159 (2016)). "The possibility must be real, one sufficient to raise a reasonable doubt as to whether [the error] led the jury to a verdict it otherwise might not have reached." Id. at 608 (alteration in original) (quoting State v. Lazo, 209 N.J. 9, 26 (2012)).

Here, both defense counsel and the prosecutor objected at the charge conference to the court's proposed instructions on aggravated and reckless manslaughter as lesser-included offenses to murder. Despite their objections, the court issued those manslaughter instructions after determining the need for them. In justifying its decision, the court referenced the testimony of the victim's passenger describing the shots that had been fired, the location of the bullet strikes in the lower portion of the minivan, and the delay in shooting while the perpetrators pursued the vehicle.

The passenger's testimony recounted that the red car following her and Butler had pursued them for some time before shots eventually were fired from that direction and killed Butler. Although the exact amount of time she and Butler were followed by the red car is unclear, the passenger testified that Butler circled the same block at least three times after realizing they were being followed before attempting to speed away from it. Her testimony, coupled with

11

the photos of gunshots aimed toward the lower portion of the car, reasonably supported an inference that the shooter's intent could have been not to kill Butler but to disable the vehicle. The judge reasoned that because these pieces of evidence raised questions in his own mind as to the intent of the shooting, they would likely raise questions in the jurors' minds as well.

We concur with the trial judge that the record contained evidence that "clearly indicated" and supported a jury finding of either aggravated or reckless manslaughter within the meaning of the applicable statutes. A person commits the crime of reckless manslaughter when that person recklessly causes death— that is, "'consciously disregard[s] a substantial and unjustifiable risk' that death 'will result from his conduct.'" State v. Curtis, 195 N.J. Super. 354, 363–64 (quoting N.J.S.A. 2C:2-2(b)(3)); see also N.J.S.A. 2C:11-4(b)(1). Alternatively, a homicide constitutes aggravated manslaughter if the defendant not only "recklessly causes death" but does so "under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a)(1).

The State's proofs included evidence that showed the person or persons responsible for Butler's death shot at the minivan multiple times at the lower portion of the vehicle. The video evidence corroborated the passenger's testimony that the red car followed behind Butler's minivan for some time before

12

shots were fired. This delay in pursuing the minivan without firing shots might have caused the jury to conclude the necessary intent to kill required for first-degree murder, N.J.S.A. 2C:11-3, was not present and that the shooter instead had a less culpable state of mind.

We are satisfied that evidence supporting the lesser-included manslaughter offenses "jump[ed] off the page" to an extent that the unrequested charges were "clearly indicated." Canfield, 252 N.J. at 501. As the trial court reasoned, a juror could logically conclude, based on the video evidence of the drawn-out pursuit and photo exhibits of the trajectory rods in Butler's vehicle, that defendant intended only to disable the vehicle rather than kill Butler, but that his actions in engaging in this violent pursuit were nonetheless reckless, N.J.S.A. 2C:11-4(b)(1), and perhaps even performed "under circumstances manifesting extreme indifference to human life," N.J.S.A. 2C:11-4(a)(1) (defining aggravated manslaughter).

We are mindful of defense counsel's assertion to us at the appellate oral argument that this indictment was tried by counsel "as a murder case." Although a murder conviction was the State's main goal, there was ample evidence here for the jury to acquit defendant of murder and instead find him guilty of either aggravated or reckless manslaughter. The court did not err in giving those

lesser-included charges. The court rightly disallowed the "all-or-nothing" strategies of counsel on the murder count. Cf. Jenkins, 178 N.J. at 364 (sustaining reversal of murder conviction because of the trial court's failure to instruct the jury properly on lesser-included offenses, thereby leaving the jury with an "all-or-nothing" situation).

Furthermore, given the nature and quantum of the evidence presented at trial, even if hypothetically there was error, defendant has failed to establish that the jury charge led to an unjust result. R. 2:10-2. We therefore affirm the judge's charging decision and sustain the verdict on the lesser-included offense of reckless manslaughter.

## B.

Defendant argues the trial court erred in admitting Agent Hauger's expert testimony on both procedural and substantive grounds. Procedurally, he contends the State designated Hauger as an expert and served his report too late, on the cusp of the trial. Substantively, he contends the expert's testimony was inadmissible because it made unwarranted inferences about the location of his cell phone, and relied upon data that Sprint does not vouch for as reliable for litigation purposes. We are unpersuaded by these contentions.

The short notice the State provided in designating Hauger as its expert was justified in the unique circumstances presented. The applicable rules of criminal discovery are as follows.

With regard to the timeliness of expert testimony submissions, <u>Rule</u> 3:13-3(b)(1)(I) provides that

> names and addresses of each person whom the prosecutor expects to call to trial as an expert witness, the expert's qualifications, the subject matter on which the expert is expected to testify, a copy of the report, if any, of such expert witness, or if no report is prepared, a statement of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. Except as otherwise provided in <u>R.</u> 3:10-3, if this information is not furnished 30 days in advance of trial, the expert witness may, upon application by the defendant, be barred from testifying at trial . . . .

In applying these time limits, preclusion of expert testimony for failure to comply with discovery obligations is a "drastic remedy" that "should be applied only after other alternatives are fully explored." <u>State v. Mauro</u>, 476 N.J. Super. 134, 149 (App. Div. 2023). Factors weighing against preclusion include "(1) the absence of any design to mislead, (2) the absence of the element of surprise if the evidence is admitted and (3) the absence of prejudice which would result from the admission of evidence." <u>State v. LaBrutto</u>, 114 N.J. 187, 205 (quoting <u>Amaru v. Stratton</u>, 209 N.J. Super. 1, 11 (App. Div. 1985)).

15

Moreover, Rule 3:10-3(a) provides an exception to the deadline above, stating that if the

> expert witness did not conduct, supervise, or participate in a scientific or other such test about which he or she will testify, the State shall serve written notice upon the defendant and counsel of intent to call that witness, along with a proffer of such testimony, all reports pertaining to such testimony, and any underlying tests, at least 20 days before the pretrial proceeding begins, or at least 20 days before the pretrial conference. If extenuating circumstances exist, the state may file the notice after this deadline. For purposes of this rule the term "test" shall include any test, demonstration, forensic analysis or other type of expert examination.

We review a trial court's decision whether to permit the expert testimony only for an abuse of discretion. Mauro, 476 N.J. Super. at 150 (citing State v. Stein, 225 N.J. 582, 593 (2016)). No such abuse of discretion occurred here.

The pertinent chronology is as follows. The State first submitted an expert report on PCMD data in 2019, which entailed plotting specific locations on a map meant to reflect the whereabouts of defendant's cell phone at certain critical times, and defendant submitted a responsive report from his own expert. However, just a few months before trial, this court in March 2022 in State v. Burney, 471 N.J. Super. 297 (App. Div. 2022), rev'd, 255 N.J. 1 (2023) ("Burney

16

I"),[3] provided guidance on this sort of expert testimony. Burney addressed a challenge to the admission of testimony by an FBI agent regarding cell-site analysis data. Our opinion held that such evidence was admissible, but for the limited purpose of giving a general approximation of a phone's location as opposed to a pinpoint location. Id. at 323.

In the short time left ahead of trial after we issued our opinion in Burney, the prosecution concluded that testimony pursuant to the existing expert's report would not comply with this precedent. Consequently, the State obtained a new report, this time from Hauger, using the cell tower data to estimate more approximate locations, but was not able to submit it until days before jury selection.

Defendant moved to exclude Hauger's testimony based on untimeliness. The trial court denied the motion. The court made clear at the outset that it intended to "more closely" follow Rule 3:10-3 than Rule 3:13-3, apparently on the notion that Hauger would not be testifying regarding any "test" he had himself conducted. In any event, the court observed that even Rule 3:13-3 did not mandate exclusion for a violation of the deadline. It concluded extenuating circumstances justified the late production because the new report was required

---

[3] We discuss the implications of the Supreme Court's opinion in Burney, infra.

to comply with our opinion in <u>Burney</u>, which, as a practical matter, was not issued until this case had already been on the trial list.

The trial court reasoned further that defendant already had an expert who had opined as to the reliability of PCMD and would be given time to respond to Hauger's report as well. Given the time constraints, the court concluded it would be appropriate to permit the defense to give a less formal response at trial, instead of a written response to the State's new expert opinion.

Defendant argues the court's decision to permit Hauger's testimony, despite the State's noncompliance with the time frames of <u>Rule</u> 3:13-3(b)(1)(I), resulted in a denial of justice. Defendant claims that he was prejudiced by the late submission because his counsel had only a little over a week to consult with his own expert witness to rebut the State's late-submitted expert opinion.

We discern no abuse of discretion by the trial court in its balanced and sensible handling of this discovery matter. The court's decision to allow the State to comply with our opinion in <u>Burney</u> did not rest on an impermissible basis, nor was it devoid of a rational explanation. The court fairly allowed the defense time to communicate with its expert, who had already given his opinion on PCMD, and relaxed the defendant's discovery obligations by allowing a

proffer response to Hauger's report instead of a formal updated defense expert report.

In sum, Hauger's testimony justifiably was not excluded on procedural grounds. The court handled a difficult and unanticipated situation in an equitable manner to accommodate the search for the truth. N.J.R.E. 102.

We next consider defendant's substantive argument asserting that Hauger's expert testimony was unreliable.

As we noted above, Hauger testified as to how he and his team analyzed the PCMD record that Sprint had provided to determine the general location of where a phone had been. He frankly acknowledged that the PCMD was "not 100 percent accurate." Even so, he testified that the FBI was able to locate missing persons using PCMD to determine "how far away from [a] tower [a] phone [is] measuring"; Hauger referred to this range as an arc. He stated that once able to identify a tower being used by an individual's phone, he could use his investigative skills to locate missing persons based on PCMD. He testified further that he had used PCMD to locate persons "a couple hundred times" through different carriers and "a little over a hundred times" using PCMD data specifically from Sprint. The methodology used to analyze PCMD, Hauger

testified, was reproducible and could be verified for accuracy by other CAST members.

The court denied defendant's motion to bar Hauger's expert testimony after reasoning that PCMD was an optimization tool that the provider, Sprint, had an interest in making as accurate as possible for the purposes of ensuring reliable and efficient coverage. It reasoned that "[f]or the purposes of analysis, the data does not need to be perfect" and that

> while the data relied upon is clearly, as testified to, not perfect data, his analysis is also not exact. He puts in a range, not a pinpoint spot, so it is not inherently misleading either. He is demonstrating that there is a level of inconsistency or interpretive range within each of these readings.

The court found that it was up to the jury "to consider how good the information is that the expert is relying upon" and that the expert testimony did not overstate its accuracy. Accordingly, the court determined that Hauger's expert testimony had satisfied the "general acceptance" standard of reliability of <u>Frye v. United States</u>, 293 F. 1013 (D.C. Cir. 1923), which was then applicable in New Jersey criminal cases.[4]

---

[4]  <u>See</u> <u>State v. Olenowksi</u>, 253 N.J. 133, 139 (2023) (prospectively adopting in New Jersey criminal cases the multi-factor "<u>Daubert</u>" standard for assessing the reliability of an expert's methodology).

On appeal, defendant argues the court erred in admitting Hauger's expert testimony because the cell data analysis was not shown to be reliable enough to satisfy N.J.R.E. 702. At oral argument on the appeal, defense counsel clarified that defendant is not categorically arguing that PCMD cell tower analyses are inadmissible under Frye. Instead, defendant maintains that the particular steps that Hauger followed in applying that methodology did not justify presenting his opinion to the jury about the whereabouts of defendant's cell phone at the time of the shooting. The State contends the trial court's decision to permit Hauger's testimony is consistent with case law admitting other PCMD experts, and it was not an abuse of discretion. State v. Rosales, 202 N.J. 549, 562–63 (2010) (applying an abuse of discretion scope of appellate review to pre-Olenowski criminal cases).

Our analysis of this issue is substantially guided by the Supreme Court's opinion in State v. Burney, 255 N.J. 1, 21–25 (2023) ("Burney II"). In the Burney case, the State's expert witness, a different FBI agent presented testimony based on historical cell-site data analysis "for the limited purpose of providing a general approximation of defendant's geographical location at the time of the robbery." Burney I, 471 N.J. Super. at 308. This included testimony about the coverage area of a specific cell tower sector where the defendant's cell

phone allegedly "pinged" or connected with the tower upon receiving a text message at a specific time on the night of the robbery. Id. at 320.

The agent in Burney testified that on the night of the robbery, a text message caused defendant's phone to connect with a cell tower sector directed toward the site of the robbery, suggesting that the defendant was likely within one mile of the robbery location at the time it occurred. Id. at 308. The expert stated that the cell tower sector communicating with defendant's phone when he received the text message in question "had an approximate one-mile radius area that either covered or came very close to the victims' home . . . ." Id. at 320.

According to the agent in Burney, he used information that Sprint provided, call detail records and PCMD, to create maps that depicted the towers that the defendant's phone had connected to on the night of the robbery. Burney II, 255 N.J. at 12. After plotting the cell towers onto the maps, the expert drew two lines from them that resembled 120-degree pie-shaped wedges extending from the cell tower's pinged sectors. Ibid. The agent then testified that each of the lines he had drawn had an approximate length of one mile and that the space between the lines was the coverage area of the tower sector. Ibid. When asked how he had determined the length of the lines, the expert testified that

> the length that was used for these arms is, again, an estimate and these are one mile, which is a rule of

thumb for this particular technology and this particular frequency in this particular area. So just based on my training and experience, one mile is a good estimate of the tower range for Sprint in this area.

[Ibid. (emphasis added in part and omitted in part).]

Based on this information, the agent in <u>Burney</u> opined that the defendant's cell phone connected with a cell tower sector that encompassed the crime scene. <u>Ibid.</u> On appeal, this court upheld the admission of the expert's testimony in <u>Burney I</u>, with the caveat that the expert should be confined to a "general approximation" of the defendant's location. <u>Burney I</u>, 471 N.J. Super. at 320.

The Supreme Court reversed our decision, holding that the expert's testimony about his "rule of thumb"—which estimated a one-mile radius coverage range for a cell tower in locating a phone—was a net opinion that lacked factual support. <u>Burney II</u>, 255 N.J. at 25. In this regard, the Court noted:

> Special Agent David did not testify that such approximation is common practice in cell tower analysis, or that his one-mile "rule of thumb" had been used by any other agent or radio frequency engineer. Additionally, Special Agent David candidly admitted that he did not review the height of the Parkway Tower, did not review its rated power, did not calculate the estimated absorption of radio energy by nearby buildings or hills, did not review the specific angle of the tower's antenna, and did not review any diagnostic data from the tower on December 25. Special Agent David similarly did not perform any tests of the Parkway Tower's area of signal coverage.

23

[Id. at 24–25.]

The Court was clear that not all of these factors were required to make testimony on PCMD admissible. Id. at 25. Instead, the expert's testimony there was inadmissible because he did not testify to anything other than his own personal experience. The Court further implied that the expert overstated the reliability of the data when the agent "emphasized to the jury that it was 'highly, highly unlike[ly]' that the [tower] did not cover the crime scene based on the tower's approximated coverage distance." Id. at 15 (first alteration in original). The Court also noted that, in its closing statement, the State highlighted that the expert's testimony was the most credible of all the witness testimonies. Id. at 29–30.

The present case is distinguishable from Burney. Agent Hauger did not present any "rule of thumb" to the jury. Instead, Hauger testified that defendant's phone appeared to have passed through one or more the ranges connected to the tower, without himself suggesting a probable distance.

Hauger's testimony also materially differs from the expert in Burney in that his analysis was not based solely on personal experience; rather it was grounded in a methodology that was demonstrated to be reliable among others in his field. See Townsend v. Pierre, 221 N.J. 36, 53 (2015). He explained in

24

detail the process he used to map the towers using PCMD, stating that these maps provide a general approximation for locating phones. He also testified that previous efforts to locate missing individuals and fugitives using the same mapping methodology based on PCMD yielded accurate results, often placing agents within a few feet of their intended targets, further demonstrating the reliability of the methodology. See id. at 55 (citing Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). This is fundamentally different from relying on an unsupported personal assumption about a tower's coverage range. Additionally, Hauger did not testify to any coverage range for the tower sectors based on the maps he had generated; when he did provide an estimated distance, they were directly from the PCMD records from Sprint.

Hauger's testimony also responsibly emphasized the limitations of the data he used, explaining that the Sprint data had inaccuracies, and reiterating that the maps generated from the PCMD could only offer general locations. His repeated acknowledgement of these limitations further distinguishes his testimony from the net opinion found in Burney II.

Notably, our Supreme Court in Burney II did not reject the reliability of expert testimony based on historical cell tower analyses. Burney II, 255 N.J. at 21–22. In fact, the Court acknowledged that, "[a]cross the nation, state and

federal courts have accepted expert testimony about cell site analysis for the purpose of placing a cell phone within a 'general area' at a particular time." Ibid. The Court cited to an opinion of the Seventh Circuit Court of Appeals that upheld the admissibility of testimony based on historical cell-site analysis, because the testimony included explanations about the limitations of the data. Id. at 21–22 (citing United States v. Hill, 818 F.3d 289, 299 (7th Cir. 2016)).

In Hill, the Seventh Circuit held that testimony on historical cell-site analysis was admissible, where the expert disclaimed the ability to pinpoint a defendant's phone's exact location and described the limitations of the analysis. 818 F.3d at 299. The defendant in Hill, appealing a conviction of several offenses related to robbery, argued that the expert testimony about historical cell-site analysis did not meet the requirements for reliability outlined in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589. Id. at 295. The expert testified that he used cell-site analysis to determine that the defendant's phone had been in the general vicinity of the crime scene on the day of the robbery. Id. at 298. The court found that the expert's analysis was sufficiently reliable to show that a phone was in a general area and not a pinpoint location. Id. at 299. In fact, the court was most concerned "that the jury may overestimate the quality of the information provided by this analysis"; thus it

26

"caution[ed] the government not to present historical cell-site evidence without clearly indicating the level of precision—or imprecision—with which that particular evidence pinpoints a person's location at a given time." Ibid. The Court of Appeals concluded that "[t]he admission of historical cell-site evidence that overpromises on the technique's precision—or fails to account adequately for its potential flaws—may well be an abuse of discretion." Ibid.

Agent Hauger's expert testimony in this case aligns with the principles expressed in Hill. Hauger did not opine on the exact location of defendant's phone. He explained to the jury the limitations of the PCMD information as well as its proven utility in locating missing persons. He did not overstate the significance of his analysis. In sum, the trial court did not abuse its discretion in concluding the expert testimony was sufficiently reliable and helpful to the jurors to pass muster under N.J.R.E. 702.

Defendant's claim that he was unduly prejudiced by Hauger's expert opinions is unpersuasive. Unlike the State's closing argument in Burney, the prosecutor in this case carefully refrained in summation from overstating the probity of Hauger's opinions. The prosecutor acknowledged that the methodology "is not perfect" and made clear that the State was not relying on Hauger's testimony to establish defendant's distance from the cell tower. At

27

most, the summation focused on how Hauger's testimony showed defendant's movements between pie-shaped sectors of the cell tower at relevant times. That focus on movement distinguishes the present case from Burney. The expert testimony and the closing argument, considered in combination, were not "clearly capable of producing an unjust result." R. 2:10-2.

For these reasons, we affirm the admission of Agent Hauger's expert testimony and reject defendant's procedural and substantive arguments.

III.

Defendant's remaining arguments are likewise unavailing.

We reject defendant's challenge to the trial court's admission of the incriminating hearsay statements of Telfair and Jackson. The statements, both made under oath, were admitted for their truth as prior inconsistent statements under N.J.R.E. 803(a)(1). The trial court appropriately conducted admissibility hearings regarding the statements in accordance with State v. Gross, 216 N.J. Super. 98, 109–10 (App. Div. 1987) (enumerating numerous factors bearing on admissibility under the hearsay exception), aff'd, 121 N.J. 1 (1990). We concur with and incorporate by reference here the trial court's sound application of the Gross factors. Although both Telfair and Jackson arguably had reasons to be biased, inaccurate, or otherwise lacking in credibility in their police interviews,

the defense capably sought to impeach those witnesses through cross-examination. We discern no abuse of discretion in the court's evidentiary rulings as to both witnesses. State v. Garcia, 245 N.J. 412, 430 (2021).

Defendant's claim that the verdict was against the weight of the evidence is without merit. The State presented ample evidence that jurors could reasonably conclude was sufficient to establish beyond a reasonable doubt defendant's commission of reckless manslaughter. State v. Reyes, 50 N.J. 454, 458–59 (1967). The court appropriately denied defendant's motion for judgment of acquittal under Rule 3:18-1. Defendant points out inconsistency within the jury's verdict acquitting him of the weapons possession charges but convicting him of recklessly shooting Butler. However, such inconsistency is permissible under our case law where, as here, there is sufficient evidence to support the guilty verdict that was rendered on the manslaughter count. State v. Banko, 182 N.J. 44, 46 (2004).

Defendant's allegation of prosecutorial misconduct in the State's grand jury presentation concerning the timing of the cell phone texts, a point which was not raised below, is foreclosed by the petit jury's guilty verdict. United States v. Mechanik, 475 U.S. 66, 72–73 (1986).

The extended-term sentence imposed on defendant for this second-degree offense was authorized because of his criminal record that qualifies him as a persistent offender under N.J.S.A. 2C:44-3(a).  His prior offenses, which included two indictable convictions and a federal conviction, were significant, and not, as defendant's brief characterizes them, a mere "criminal spell."  The trial court did not misapply its wide sentencing discretion and reasonably weighed the three aggravating factors and the sole mitigating factor of restitution.  State v. Case, 220 N.J. 49, 65 (2014).

To the extent that we have not mentioned them, all other points raised by defendant lack sufficient merit to warrant discussion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0133-22