# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0283-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ALEJO GONZALEZ-SANTOS,
a/k/a GONZALEZ SANTOS
ALEJO, ALEJO GONZALEZ,
ALEJO GONZALEZSANTOS,
and ALEJO SANTOS,

    Defendant-Appellant.

_____

Submitted November 19, 2024 – Decided December 26, 2024

Before Judges Chase and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 21-07-0381.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Ethan J. Kisch, Assistant Deputy Public Defender, of counsel and on the brief).

William A. Daniel, Union County Prosecutor, attorney for respondent (Milton S. Leibowitz, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant, Alejo Gonzalez-Santos, appeals from his jury trial conviction for first-degree aggravated sexual assault of a victim under thirteen years old, N.J.S.A. 2C:14-2(a)(1), and other offenses. Under the Jessica Lundsford Act, N.J.S.A. 2C:14-2(a), (d), the court sentenced him to an aggregate forty years' imprisonment subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, Megan's Law, N.J.S.A. 2C:7-1 to -23 and parole supervision for life, N.J.S.A. 2C:43-6.4. Defendant appeals from his conviction and sentence and raises the following points for our consideration:

> POINT I: THE TRIAL COURT'S ADMISSION OF EXPERT TESTIMONY THAT STATISTICAL ANALYSIS PROVED [DEFENDANT] WAS THE FATHER OF G.M.'S CHILD WAS REVERSIBLE ERROR BECAUSE THE EXPERT'S CONCLUSIONS WERE NET OPINIONS.
>
> POINT II: EVEN IF [DEFENDANT'S] CONVICTIONS ARE NOT REVERSED, THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE TRIAL COURT MISAPPLIED AGGRAVATING FACTOR THREE.

We reject the arguments and for the reasons that follow, we affirm.

I.

A-0283-23

We summarize the facts that led to defendant's arrest and conviction from the trial record. In the fall of 2018, G.M.[1] lived with defendant, her mother, her two siblings, and her aunt. G.M. was twelve-years old at the time, and defendant was G.M.'s stepfather since she was a toddler. Defendant slept in his own room; it was across the hall from another bedroom in which G.M. slept with her mother and her two siblings.

G.M. testified that one evening in September 2018, she fell asleep while watching TV in defendant's bed. G.M. stated when she fell asleep, she was wearing pants and underwear, but that she later woke up "with my pants down, my underwear down and—and I woke up confused." G.M. further testified defendant was laying behind her on the bed with his shorts pulled down with his penis penetrating her vagina. G.M. testified that she "got up," "immediately pulled my pants up and I also felt wet, so I went to the bathroom and cleaned myself." Defendant then told G.M. "[t]hat he was sorry and to not tell [her] mom what had happened." G.M. stated she then went to her mother's bedroom and fell asleep, without waking up her mother or siblings. G.M. testified that

---

[1] Initials are used, and parties' names are otherwise not used, to protect the victim in this matter concerning a sexual offense. R. 1:38-3(d)(10).

she did not tell anyone what happened because she did not want to "split up the family."

In the following months, G.M. did not have her monthly periods, and by December 2018 she began to worry that she was pregnant. G.M. told defendant and he offered to buy a pregnancy test, but she declined. G.M. stated she did not get her period in January or February 2019, but that she did not tell anyone because "I didn't really show signs of pregnancy, and I was very thin."

G.M. testified that in March of 2019 she again told defendant she might be pregnant. G.M. stated she made this revelation to defendant after noticing her weight gain and that she felt movements in her stomach like a baby kicking, which she had never felt before. Subsequently, defendant bought G.M. a pregnancy test, which was positive. G.M. testified that she was certain defendant was the father because "I had never had intercourse with anybody else."

G.M. testified that defendant told her not to tell her mother he was the father, but instead to tell her the father was a boy from school. G.M. told her mother she was pregnant and told her a classmate named "Juan Diego" got her pregnant. G.M. testified she made that name up because "it was like the first name that came to mind," but no one in her school had that name.

A-0283-23

In June 2019, G.M. gave birth to her son, M.M. G.M. was thirteen-and-a-half years old when she gave birth. A representative from the Division of Child Protection and Permanency ("DCPP") interviewed G.M. after the birth because she had planned to sleep in the same bed as M.M. During that interview, G.M. told DCPP M.M.'s father was Juan Diego; G.M. made this same statement during a subsequent interview with DCPP and police months later.

In February 2021, police again interviewed G.M.; once more she told them Juan Diego was the father of M.M. and denied defendant had ever touched her sexually. Police then presented G.M. with the DNA test results which showed defendant was the father of M.M.. G.M. then admitted to police that defendant was M.M.'s father. During her testimony, when asked on re-direct why she lied about defendant being M.M.'s father repeatedly, G.M. stated she was protecting defendant and did not want to break up her family.

A Grand Jury returned an indictment charging defendant with first-degree aggravated sexual assault of a victim under thirteen years old, N.J.S.A. 2C:14-2(a)(1); second-degree sexual assault of a victim under thirteen by a person four or more years older, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child by a person with responsibility for the victim's care, N.J.S.A. 2C:24-4(a)(1). A jury convicted him of committing each of the charged

offenses. The trial court sentenced him and entered a judgment of conviction. This appeal followed.

II.

We begin our review by addressing defendant's contention that the State's DNA expert proffered a net opinion. Defendant did not object nor seek to strike any of the challenged testimony, nor were his arguments raised before the trial court in any other fashion. We therefore consider them under the "plain error" standard, that is, whether defendant proved an error occurred that was "clearly capable of producing an unjust result . . . ." R. 2:10-2; State v. Prall, 231 N.J. 567, 581 (2018); State v. Funderburg, 225 N.J. 66, 79 (2016).

Under N.J.R.E. 703, an expert's opinion must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence, but which is the type of data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). "The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Id. at 53-54 (quoting Polzo, 196 N.J. at 583). The rule "mandates that experts 'be able to identify the

factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). "An expert's conclusion 'is excluded if it is based merely on unfounded speculation and unquantified possibilities.'" Ibid. (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

"[A]n expert offers an inadmissible net opinion if he or she 'cannot offer objective support for his or her opinions but testifies only to a view about a standard that is personal.'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). "To avoid a net opinion, the expert must 'give the why and wherefore' that supports the opinion." Ehrlich v. Sorokin, 451 N.J. Super. 119, 134 (App. Div. 2017) (quoting Townsend, 221 N.J. at 54). "Expert testimony 'otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by [the jury].'" State v. Cain, 224 N.J. 410, 420 (2016) (quoting N.J.R.E. 704) (emphasis in original).

III.

Applying the plain error standard to the trial court's admission of the testimony of Delores Coniglio-Rivera, a forensic scientist in the DNA unit at

A-0283-23

the State Police Laboratory, we discern no error. Coniglio-Rivera's testimony came after a detective from the Essex County Prosecutor's Office testified to obtaining buccal swabs and their chain of custody.

Coniglio-Rivera began her testimony by explaining her education and background, and the laboratory's accreditations, and quality control methods. She then testified to the basics of DNA testing. The court then qualified the expert and explained to the jury what Rule 702 in the New Jersey Rule of Evidence was, and how it allows persons qualified in their field, by their training, education, and experience, to provide opinion testimony. The court instructed the jury it was up to them to evaluate the evidence and accept or deny it as they "see fit."

Coniglio-Rivera confirmed that DNA "[p]rofiles were generated for all three reference samples"—that is, the buccal swab samples from G.M., M.M., and defendant. She then explained how she tests for paternity: "[i]n the case of a paternity where we have DNA profiles from a mother, a biological child, and alleged father, because of what we know about genetics, we know that a child is going to receive half of their DNA from their mother and half from their father." She further explained that she:

> then compar[es] the DNA profile of the mother and the
> child and look for any alleles at those locations that we

test for that are different across the two of them, because that means that that allele had to have come from the father, right? So it didn't come from the mother. It had to have come from the father.

She then:

look[s] at the combination of those alleles that we know had to come from a father, compare that to the alleged father—the DNA profile from the alleged father in this case, and attempt to exclude him as a potential father because if he's—his DNA profile did not contain those alleles that we know had to have come from the father, then we can exclude him as being a potential father.

Coniglio-Rivera then testified that based on the review of the allele tables, defendant "could not be excluded as the potential father." Because defendant was now included as a potential father, "the next step was to perform a statistical evaluation of the DNA profiles to determine what's referred to as a likelihood ratio which gives us a paternity index . . . ." She went on to explain that the "likelihood ratio" reflects "if that alleged father is the actual, true biological father, versus what is the probability of seeing these three DNA profiles if the— if some random man unrelated to [defendant] . . . [w]as the actual biological father and not [defendant]." Further, she explained that a likelihood ratio number "can range anywhere from zero to infinity . . . . So the higher the value of that number, the more support is being provided for the particular hypotheses that it's providing support for."

9

Here, she testified, the "likelihood ratio in support of [defendant] being the father is somewhere I think in the billions, I believe. 4.8 billion." After looking to her laboratory report, which was marked for identification but not entered into evidence, she then confirmed her calculation that "[t]he three DNA profiles that we see from these individuals is at least 4.8 billion times more likely to occur if G.M. and [defendant] are the parents, rather than if G.M. and a randomly selected unrelated individual are the parents."

Next, Coniglio-Rivera provided a second statistical conclusion called the "probability of parentage," explaining it is:

> a different way to represent a likelihood ratio and it's in a percentage form rather than a number. And the probability of parentage is at least 99.99 percent for the African American, Caucasian, and Hispanic populations. And we denote those three populations because any time we calculate statistics in the laboratory, we are always using . . . [those] allele frequencies from those three populations because those are the three most prevalent populations in the United States.

Coniglio-Rivera answered in the affirmative when she was asked "is it [her] conclusion that M.M. is the offspring of G.M. and [defendant]?" Additionally, she stated the probability of parentage was "at least 99.99 percent," that defendant was the father of M.M., and proffered "it was impossible to get a hundred percent."

A-0283-23

Here, the expert's testimony was not a net opinion. This is evidenced from the testimony given by Coniglio-Rivera at trial, detailing the science of DNA, and her methodology and facts from which she based her conclusions. She began her testimony regarding the DNA evidence by stating what the acronym DNA stood for—deoxyribonucleic acid—where it can be obtained from, and how your DNA profile remains the same throughout your life. After setting this foundation, she then detailed how DNA is packaged into chromosomes, which are the location where our genes are found. Further, she explained how genes "can appear in different forms that are referred to as alleles."

Next, she testified that her laboratory evaluates twenty-four to twenty-seven different areas of the DNA. She then explained that each area is called a locus, and at each loci there is a short tandem repeat ("STR"). She then stated there is an STR at each location they test; further explaining the STR is a small piece of DNA repeated a specific number of times, and what is different among different individuals "is the number of repeats they have at those [twenty-four to twenty-seven] locations or loci that we test for." She further explained that DNA profiles, are essentially "going to be a string of numbers that reflects the number of repeats or alleles at all of these locations or loci that we test for."

11

Moreover, she testified that everyone gets fifty percent of their chromosomes from their mother, and the other fifty percent from their father. And, then she explained the purpose of STR testing was to "generate a DNA profile that we can use for comparisons to crime scene samples." Additionally, she explained that a reference sample was one taken from a known individual, usually a victim or known suspect of a particular crime, and that it is typically done via a buccal swab, which is then brought to a laboratory in order to generate a DNA profile.

Next, Coniglio-Rivera detailed the four-step process the laboratory uses to generate DNA profiles, and how the person analyzing the profile then writes a report with their conclusions and interpretations. She also testified to the positive and negative controls that run along their four-step process which would indicate if a contamination occurred during the testing process. She verified that the numbers on three items, all buccal swabs, matched the names of M.M., defendant, and G.M., and the lab was requested to conduct DNA testing to determine paternity.

Moreover, Coniglio-Rivera explained what a paternity test referred to and testified that the four-step process, previously explained in detail, was used in this case to generate DNA profiles from each buccal swab. From this, she

testified in detail how she compared the DNA profiles, and how ultimately defendant was not excluded, but instead included as a potential father for M.M., so they subsequently performed a statistical evaluation of the DNA profiles to determine their likelihood ratio, in order to produce their paternity index.

In this case, it is clear Coniglio-Rivera offered an abundance of objective support for her opinion. She provided the jury with great detail regarding the science of DNA, the reliability of the methodology, which is used in order to analyze DNA evidence, and how paternity is determined. Her opinion was far from unfounded or speculative, or a mere conclusion. Instead, her opinion was supported by the overwhelming factual evidence and data. She provided a thorough and detailed explanation to the jury for each step of the DNA analysis and how it led to the conclusion the likelihood ratio was 4.8 billion times more likely that defendant was the father of M.M., with a 99.99 percent probability of parentage. As such it was not a net opinion.

IV.

We next turn to defendant's assertion that the court misapplied aggravating factor three[2]—the risk defendant will commit another offense— because contrary to the court's factual finding, he was remorseful, and repeatedly

_____

[2] N.J.S.A. 2C:44-1(b)(3).

took responsibility for his actions during his probation interview, pre-sentencing psychological examination, sentencing submission, and during his in-court statement. Defendant proclaims that at sentencing, he "specifically asked G.M. for forgiveness." Defendant asserts the court ignored the above and misapplied aggravating factor three. As such, he posits the sentence should be vacated and remanded for resentencing.

Our "review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018); State v. Torres, 246 N.J. 246, 272 (2021). We should defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014). We will "not substitute [our] judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). Instead, we will affirm the sentence unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Ibid. (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

14

"[T]he Code, our case law and the court rules prescribe a careful and deliberate analysis before a sentence is imposed." Fuentes, 217 N.J. at 71. A "'general'" statutory framework guides "'judicial discretion . . .' to ensure that similarly situated defendants [do] not receive dissimilar sentences." Id. at 72 (alteration in original) (quoting State v. Natale, 184 N.J. 458, 485 (2005)). "When the trial court fails to provide a qualitative analysis of the relevant sentencing factors on the record, [we] may remand for resentencing." Id. at 70.

A qualitative analysis requires consideration of the sentencing factors under N.J.S.A. 2C:44-1. Id. at 72. First, the sentencing judge must identify whether any aggravating factors under N.J.S.A. 2C:44-1(a) apply, and whether any mitigating factors under N.J.S.A. 2C:44-1(b) apply. Ibid. "Each factor found by the trial court to be relevant must be supported by 'competent, reasonably credible evidence.'" Ibid. (quoting Roth, 95 N.J. at 363). Then, the court must "balance the relevant aggravating [] and mitigating factors. The [judge] does more than quantitatively compare the number of pertinent aggravating factors with the number of applicable mitigating factors; the relevant factors are qualitatively assessed and assigned appropriate weight in a case-specific balancing process." Id. at 72-73 (citations omitted).

A-0283-23

Importantly, "[a]t the time of sentencing, the court must 'state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting sentence.'" Id. at 73 (quoting R. 3:21-4(g)). "A careful statement of reasons" should address the factors at issue to demonstrate both to defendants and the public that all arguments have been evaluated and to "facilitate[] appellate review." Id. at 74. Indeed, "a trial court should explain its analysis of N.J.S.A. 2C:44-1's aggravating and mitigating factors with care and precision," to "avoid disparity in sentencing as the Legislature intended, to facilitate fair and effective appellate review, and to ensure that the defendant, the State and the public understand the reasons for the sentence . . . ." Id. at 81.

Here, the court's finding of aggravating factor three was not an abuse of discretion. Defendant correctly points out that in this case, the sentencing judge found aggravating factors two, three, and nine, and mitigating factor seven, but argues the explanation by the court for imposing factor three was "contradicted by the evidence" because he has taken responsibility and shown remorse for what he has done. This argument lacks merit.

In justifying aggravating factor three, the court stated:

> I also find that based on the fact that even to this day,
> the defendant refuses to take responsibility, expresses

no remorse, has failed to apologize, and was the one that asked her to lie, I 100 percent agree that Aggravating Factor Number 3, is—is here. There is absolutely—the fact that defendants [sic] still, despite the overwhelming evidence beyond a reasonable doubt that defendant committed this offense, he fails and refuses to admit he did. And so I do believe there is a risk that, if released into society, there is a clear risk that he will commit another offense like that, and that should not ever happen.

Although his presentencing report does quote defendant as saying that "[he] regret[ted] what happened," and did not understand how he did this; he also repeatedly alluded to the fact that he was drunk and could not remember the offense. Further, in the same report, defendant was quoted as saying "[G.M.] was fine and had a baby. I thought it was not mine because I did not have a relationship with her." Defendant further stated he "was helping her with school," and "[t]old her that if she did not want the baby, we can arrange something." Defendant also stated that he was unaware it was his baby until the paternity test revealed otherwise. These statements made by defendant himself show a lack of remorse, and instead show defendant deflecting blame and trying to excuse his actions because he was allegedly under the influence of alcohol.

It was not until the very end of his statement that he finally turned his attention to G.M., but his initial statement to her was not an apology. Instead, he stated how G.M. is a daughter to him, that he raised and took care of her, and

17

then once again he denied any memory of abusing her. Finally, defendant eventually asked G.M. for her forgiveness, but not before airing his grievances first. After defendant made his initial statement, and the court was ready to proceed with sentencing, defendant made one more statement where he said the following: "[t]he State doesn't really know what they're doing, hurting these little kids like that. It's not me, it's the State . . . ." The above-mentioned statements made by defendant, which overwhelmingly centered on how all of this affected him, illustrate his lack of accountability and remorse. Defendant could have received a life sentence, but instead was given a forty-year sentence which was "below the midpoint of the permissible sentencing range."

To the extent we have not specifically addressed any remaining arguments, it is because we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18                                                                    A-0283-23